FILED
COURT OF APPEALS
DIVISION II

2014 FEB 27 PM 2: 19

STATE OF WASHINGTON

BY_____
          DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41795-2-II |
| Respondent, | |
| v. | |
| ROBERT JOHN MADDAUS, | ORDER GRANTING RECONSIDERATION IN PART AND DENYING IN PART BY AMENDING MAJORITY |
| Appellant. | |

Appellant Robert John Maddaus has filed a motion for reconsideration of our unpublished opinion filed on September 20, 2013. We grant Maddaus's motion for reconsideration, in part, by making the following changes to our unpublished opinion filed September 20, 2013:

(1) In the first sentence of the first full paragraph on page 2, which begins, "In his Statement of Additional Grounds (SAG)" and carries over to page 3, we

* delete the word "a" from the third line of the paragraph;

* change the word "slide" to "slides" in the fourth line of that same paragraph;

* add the phrase "showing exhibits that had been altered, including" after the word "slides";

* delete the word "containing" after that addition;

* add the phrase "(4) the trial court erred in denying a motion to dismiss for discovery violations;" after the citation to CP at 978; and

\*     change the reference to "(4)" before the word "cumulative."

With these changes, this sentence now reads,

> In his Statement of Additional Grounds (SAG), Maddaus asserts that (1) the trial court erred in denying his request for new appointed counsel; (2) the trial judge was unfairly biased against him; (3) the State committed prosecutorial misconduct by displaying Microsoft Power Point slides showing exhibits that had been altered, including a photograph of Maddaus wearing a wig, with a circle and a slash superimposed over it and the word "GUILTY" written beneath it, CP at 978; (4) the trial court erred in denying a motion to dismiss for discovery violations; and (5) cumulative error violated his right to a fair trial.

(2) In the last paragraph on page 5, which begins, "Meanwhile, Maddaus had acquired," we

\*     delete the phrase "and a photo of himself wearing a blond wig" from the first sentence;

\*     after the record citation following the above change, add this new second sentence, "The police found a blonde wig in Maddaus's vehicle when they arrested him.";

\*     in the sentence after this addition, which begins, "When asked why he had," insert the words "a blonde" after the word "had" and before the word "wig"; and

\*     delete the last sentence in this paragraph, which read, "The police found this wig in Maddaus's vehicle when they arrested him."

With these changes, this paragraph now reads,

> Meanwhile, Maddaus had acquired a wig and a false passport bearing the name "Chad Walker Vogt." 17 VRP at 2003. The police found a blonde wig in Maddaus's vehicle when they arrested him. When asked why he had a blonde wig, he stated, "Because I knew there was a warrant out for my arrest. The police wanted to talk to me. I didn't want to talk to them." 15 VRP at 1868.

(3) Before the period at the end of the first sentence of the first full paragraph on page 13, which begins, "The State also presented," we substitute the phrase and punctuation ", including several slides depicting photographic exhibits with text superimposed"; this changed sentence now reads,

The State also presented Microsoft PowerPoint slides during its closing argument, including several slides depicting photographic exhibits with text superimposed.

(4) In the last sentence of the first full paragraph on page 13, which begins, "Maddaus did not object," we delete the words "this slide" and replace them with the words "these slides."; this changed sentence now reads,

Maddaus did not object to these slides.

(5) In the first sentence of the last paragraph on page 13, which begins, "It appears," we delete the word "this" after the word "displayed" and substitute the word "the"; we also insert the phrase "that included the superimposed word 'GUILTY'" after the word "slide." This changed sentence now reads,

It appears that the State displayed the slide that included the superimposed word "Guilty" as the prosecutor made the following closing remarks: . . . .

(6) Before the first full sentence at the top of page 15, which begins, "In the alternative, he argues," we insert the following sentence:

In his SAG, Maddaus also asserts that the search warrant was invalid because the supporting affidavit contained "false" facts and allegations that the record did not support.

The changed ending of this paragraph now reads,

In his SAG, Maddaus also asserts that the search warrant was invalid because the supporting affidavit contained "false" facts and allegations that the record did not support. In the alternative, he argues for the first time on appeal that the search was unconstitutionally overbroad. These arguments fail.

(7) Before the last sentence in the last paragraph on page 15, which sentence begins, "Because he does not," we insert this sentence: "Nor did he challenge the facts in the supporting affidavit." The changed ending of this paragraph now reads,

Nor did he challenge the facts in the supporting affidavit. Because he does not meet his burden . . . .

(8) In the last partial sentence on page 15, which begins, "Because he does not meet his burden," we delete the words "challenge falls" and substitute the words "challenges fall"; this changed sentence now reads,

Because he does not meet his burden to show that his new challenges fall within the RAP 2.5(a)(3) exception to the preservation requirement, we address only his preserved challenge to the firearm.

(9) At the end of the first sentence in the first full paragraph on page 20, which begins, "We hold that," we insert this new footnote 18:

Although Maddaus contends that the restraints interfered with his ability to assist counsel and with his ability to testify, these bare allegations are not sufficient to establish prejudice based on the record before us. To the extent Maddaus has evidence outside the record supporting his claims of prejudice, he must raise any such claims in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

This changed sentence and new footnote now read,

We hold that, because the jury did not see Maddaus's restraints, there was no prejudice to him, and any error in ordering Maddaus to wear them was harmless.[18] *Jennings*, 111 Wn. App. at 61.

---

[18] Although Maddaus contends that the restraints interfered with his ability to assist counsel and with his ability to testify, these bare allegations are not sufficient to establish prejudice based on the record before us. To the extent Maddaus has evidence outside the record supporting his claims of prejudice, he must raise any such claims in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

(10) In the first full sentence on page 23, which begins, "He also asserts in his SAG," we

* insert "(1)" after the phrase "asserts in his SAG that";

* add the phrase and punctuation ", and (2) the trial court erred in denying the motion to continue." after the word "misconduct."

4

No. 41795-2-II

This changed sentence now reads,

> He also asserts in his SAG that (1) he received ineffective assistance of counsel based on the trial court's denial of Maddaus's motion to continue to investigate potential governmental misconduct, and (2) the trial court erred in denying the motion to continue.

(11) At the end of the first line at the top of page 25, after the text's reference to footnote 23 (which will become footnote 24 on entry of this order) and before the sentence, "Thus, this claim also fails," we insert the following sentence:

> With respect to the trial court's denial of Maddaus's motion to continue, we will reverse a trial court's denial of a continuance only upon "a showing that the defendant was prejudiced or that the result of the trial would likely have been different had the motion been granted"; Maddaus fails to make such a showing here. *State v. Kelly*, 32 Wn. App. 112, 114, 645 P.2d 1146, *review denied*, 97 Wn.2d 1037 (1982).

These changes now read,

> . . . why his counsel's performance was deficient or how counsel's performance prejudiced him.[24] With respect to the trial court's denial of Maddaus's motion to continue, we will reverse a trial court's denial of a continuance only upon "a showing that the defendant was prejudiced or that the result of the trial would likely have been different had the motion been granted"; Maddaus fails to make such a showing here. *State v. Kelly*, 32 Wn. App. 112, 114, 645 P.2d 1146, *review denied*, 97 Wn.2d 1037 (1982). Thus, this claim also fails.

(12) On page 41, we pluralize the word "Slide" in subheading D so that that the new subheading reads, "D. Power Point Slides". Also on page 41, in the first paragraph under subheading "D":

* After the first sentence phrase "other similar words surrounding it," we add ", along with several other slides depicting exhibits with additional superimposed text;" we also add a new footnote 37 between the word "text" and the semicolon, which footnote states, "*See* CP at 867, 868, 881, 885, 886, 889-92, 902-05, 907, 911-13, 940, 944, 978."

* Between the first and second sentences, we insert this new sentence, "He also contends that one of the State's slides misstated the record."

5

\*     And after the last sentence, we insert another new footnote, 38, which states,

>In addition, Maddaus appears to contend that the State engaged in misconduct by destroying or spoiling portions of the PowerPoint presentation. We decline to reach this issue because whether there were additional PowerPoint slides is a matter outside the record on appeal. If Maddaus has additional evidence related to this issue, he must present it in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

This changed paragraph with new subheading and added footnotes now reads,

### D. Power Point Slides

Maddaus also argues for the first time on appeal that (1) the State engaged in prosecutorial misconduct when it displayed a Microsoft PowerPoint slide containing a photograph of Maddaus wearing a wig police had found in his vehicle, the word "GUILTY" written beneath it, and other similar words surrounding it, along with several other slides depicting exhibits with additional superimposed text[37]; and (2) his counsel was ineffective in failing to object. He also contends that one of the State's slides misstated the record. These arguments also fail.[38]

---

[37] *See* CP at 867, 868, 881, 885, 886, 889-92, 902-05, 907, 911-13, 940, 944, 978.

[38] In addition, Maddaus appears to contend that the State engaged in misconduct by destroying or spoiling portions of the PowerPoint presentation. We decline to reach this issue because whether there were additional PowerPoint slides is a matter outside the record on appeal. If Maddaus has additional evidence related to this issue, he must present it in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

(13) In the last partial paragraph on page 42, which begins, "Moreover, the center of":

\*     In the first sentence, we delete the word "this" after the phrase "the center of" and substitute the word "the"; and

\*     in the second sentence, after the word "slide" and before the phrase "to trigger," we insert the phrase "or any of the other altered slides."

In the first line of the continuation of this paragraph at the top of page 43, after the phrase "mug shot,"

\*      we delete the word "displaying" and its preceding comma and substitute the word "of";

\*      we delete the word "as" after the word "him" and before the word "unkempt"; and

\*      after the ending citation to *Glasmann*, we insert the following sentence and add new footnote 39, which together read, "Instead, these slides contained descriptions of testimony or statements presented at the trial or statements that represented the State's argument based on reasonable inferences from the record. [FN 39: Maddaus suggests that the static PowerPoint slides in the record do not adequately represent the entire presentation, which was arguably more dynamic in real time. Again, the extent to which these slides may not accurately depict the State's presentation is outside the record before us; therefore, we cannot consider this assertion. *See McFarland*, 127 Wn.2d at 335.]"

This changed paragraph now reads:

> Moreover, the center of the single slide included a photograph of Maddaus (not a mug shot, as in *Glasmann*) wearing a wig—to remind the jury that Maddaus had intentionally obtained a false passport and had been using a disguise on the days leading to his arrest. In contrast, nothing in the record here suggests that the State used this slide or any of the other altered slides to trigger "an emotional reaction" from the jury, as was the case in *Glasmann*, where multiple PowerPoint slides repeatedly displayed Glasmann's mug shot of him unkempt and bloody. *Glasmann*, 175 Wn.2d at 706; 710 n.4. Instead, these slides contained descriptions of testimony or statements presented at the trial or statements that represented the State's argument based on reasonable inferences from the record.[39]

> ---
> [39] Maddaus suggests that the static PowerPoint slides in the record do not adequately represent the entire presentation, which was arguably more dynamic in real time. Again, the extent to which these slides may not accurately depict the State's presentation is outside the record before us; therefore, we cannot consider this assertion. *See McFarland*, 127 Wn.2d at 335.

(14) In the first full paragraph on page 43, which begins, "Applying the heightened,"

\*      in the first sentence, after the word "unpreserved", we delete the word "errors" and substitute the phrase "prosecutorial misconduct claims";

\*      in the first sentence, after the phrase "State's use of," we delete the clause "this single slide showing him in a wig that he had used to evade arrest" and substitute the phrase, "these slides";

\* in the second sentence, we delete the phrase "this slide to avoid emphasizing it" and substitute the phrase "these slides to avoid emphasizing them"; and

\* immediately after the second sentence, ending "on this basis," we add new footnote 40, which states: "Division One of our court recently filed *State v. Hecht*, No. 71059-1-I, 2014 WL 627852 (Wash. Ct. App. Feb. 18, 2014), addressing a similar prosecutorial misconduct claim in another Pierce County case. We distinguish Maddaus's case because, unlike the slides the prosecutor used in *Hecht*, the slides here did not contain statements amounting to the prosecutor's personal opinions of the defendant's guilt."

This changed paragraph now reads,

Applying the heightened standard of scrutiny for unpreserved prosecutorial misconduct claims, we hold that Maddaus has failed to show that a curative instruction would not have overcome any prejudicial effect from the State's use of these slides. Moreover, as with the previous claim, defense counsel could have strategically elected not to object to these slides to avoid emphasizing them further; this point, coupled with Maddaus's failure to show prejudice, defeats his ineffective assistance claim on this basis.[40]

---

[40] Division One of our court recently filed *State v. Hecht*, No. 71059-1-I, 2014 WL 627852 (Wash. Ct. App. Feb. 18, 2014), addressing a similar prosecutorial misconduct claim in another Pierce County case. We distinguish Maddaus's case because, unlike the slides the prosecutor used in *Hecht*, the slides here did not contain statements amounting to the prosecutor's personal opinions about the defendant's guilt.

(15) After the first full paragraph on page 43 (and before the next heading, "VI. WITNESS TAMPERING"), we insert the following new paragraph:

Maddaus also argues that another slide misstated the record: This slide was captioned, "DEFENDANT FALSE ALIBI ATTEMPT" and described several excerpts from Maddaus's jail telephone calls. CP at 915. For the first time on appeal, Maddaus specifically objects to the portion of the slide stating, "Dan Leville & Falyn Grimes 'you guys. . .protect me.'" CP at 915 (alteration in original). But this statement was a reasonable inference from the record. Nevertheless, to the extent this statement was arguably not a reasonable inference, any potential prejudice from this single statement was not significant given the other evidence of Maddaus's guilt; and Maddaus has not shown that a curative instruction would not have overcome any potential prejudice. Accordingly, Maddaus does not show prosecutorial misconduct or ineffective assistance of counsel on this ground.

(16)   On page 56, between the first full sentence, which begins, "The trial court responded," and the second full sentence, which begins, "Maddaus did not provide," we insert the following new sentence:

The trial court again address Maddaus's request for new counsel, based on the same grounds, the following day.

This changed latter part of this paragraph now reads,

The trial court responded, "I am not going to allow it at this late date. . . . I have already ruled on the letter." 3 VRP at 264.   The trial court again address Maddaus's request for new counsel, based on the same grounds, the following day.   Maddaus did not provide any new substantial reason to support his request for new counsel, especially in light of the lateness of his request three days into the trial.   Thus, we hold that the trial court did not abuse its discretion in denying this request.

(17)   On page 56, after the end of subsection VIII. B. and before the beginning of subsection VIII. C., we change the original subheading "C.   Cumulative Error" to "D. Cumulative Error" and insert the following new subsection "C" before new subsection "D" as follows:

### C. Motion To Dismiss

Maddaus next challenges the trial court's denial of his motion to dismiss or motion for mistrial based on alleged discovery violations, which he characterizes as prosecutorial mismanagement or misconduct. Maddaus argued to the trial court that the State had withheld material information related to Tremblay's testimony and to another witness's (Kyle Collins[54]) request for a "deal" from the State in exchange for his testifying against Maddaus. CP at 387. We disagree with Maddaus that the trial court erred in denying his motion.

Trial courts have wide latitude in imposing sanctions for discovery violations. *State v. Dunivin*, 65 Wn. App. 728, 731, 829 P.2d 799, *review denied*, 120 Wn.2d 1016 (1992). We will not disturb the trial court's denial of a motion to dismiss for discovery violations unless the denial constitutes a manifest abuse of discretion. *State v. Woods*, 143 Wn.2d 561, 582, 23 P.3d 1046, *cert. denied*, 534 U.S. 964 (2001).

Dismissal is an extraordinary remedy, available only when the discovery violation has materially affected the defendant's right to a fair trial. *Woods*, 143 Wn.2d at 582. Thus, before a trial court exercises its discretion to dismiss,

a defendant must prove that it is more probably true than not that (1) the prosecution failed to act with due diligence, and (2) material facts were withheld from the defendant until shortly before a crucial stage in the litigation process, which essentially compelled the defendant to choose between two distinct rights.

*Woods*, 143 Wn.2d at 583.

The record here shows the State was not aware that Tremblay's trial testimony would differ from his previous statements until Tremblay testified at trial. Thus, the State clearly did not fail to act with due diligence, and the trial court did not err in denying Maddaus's motion to dismiss to the extent it was based on in respect to Tremblay's testimony.[55]

As soon as the trial court became aware of the State's failure to communicate to Maddaus Collins' previous offer to testify against him in exchange for a plea deal, the trial court required the State to turn over this information to defense counsel and gave defense counsel the opportunity to question Collins about it.[56] Maddaus does not show that this trial court action was an unreasonable response to the State's failure to disclose information earlier. Thus, Maddaus fails to establish that the trial court abused its discretion in denying his request to impose the extreme sanction of dismissal for this arguable discovery violation.

Furthermore, Maddaus does not show that the new information about Collins materially affected his (Maddaus's) right to a fair trial. Collins had first offered to be a State witness against Maddaus in exchange for a beneficial plea deal; but when the State refused his offer, Collins had testified instead for the defense. This information, thus reflected on Collins' credibility; and the jury had already heard other information about Collins' credibility, namely that he had previously pleaded guilty to "[p]ossession with intent, delivery, bail jumping, forgery, eluding theft of a motor vehicle, obstruction of justice and dominion over a house for drug purposes." 13 RP (Jan. 26, 2011) at 1648. Accordingly, we hold that the trial court did not err in denying Maddaus's motion to dismiss or for a mistrial.

"D. Cumulative Error"

---

[54] Defense witness Collins testified at trial that (1) Tremblay had told him (Collins) that he (Tremblay) had accidentally shot Peterson; (2) Jesse Rivera had told him (Collins) that Peterson had been brought to Dan and Falyn's house so Maddaus could talk to him; (3) Peterson was handcuffed before being allowed into the house; (4) Rivera was in the house with Maddaus and others when the shots were fired outside the house; and (5) Tremblay and Peterson were outside when the shots were fired.

No. 41795-2-II

[55] Maddaus's asserted information that the State knew Tremblay would change his testimony is outside the record before us on appeal; therefore, we cannot consider it. *McFarland*, 127 Wn.2d at 335.

[56] The record does not show that defense counsel asked for additional time to review this new information or to question other witnesses.

(18)    The above changes in the text and addition of new footnotes will require corresponding changes in text pagination and footnote numbering.

We otherwise deny Maddaus's motion for reconsideration.

**IT IS SO ORDERED.**

DATED this _____27TH_____ day of _____FEBRUARY_____, 2014.

_____
Hunt, J.

I concur:

_____
Johanson, A.C.J.

11

FILED
COURT OF APPEALS
DIVISION II

2014 FEB 27 PM 12: 20

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41795-2-II |
| Respondent, | |
| v. | |
| ROBERT JOHN MADDAUS, | ORDER AMENDING CONCURRENCE |
| Appellant. | |

Appellant Robert John Maddaus has filed a motion for reconsideration of our unpublished opinion filed on September 20, 2013. I make the following changes to my concurrence filed September 20, 2013.

The concurrence introduction after the name of the judge and the first sentence of the concurrence is changed to read as follows:

> (concurring in the result only) — I concur with the result reached by the majority opinion but write separately to stress that Robert Maddaus had the right for a jury to find whether he is a persistent offender subject to incarceration for life without the possibility of parole under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570.

**IT IS SO ORDERED.**

**DATED** this 27TH day of FEBRUARY, 2014.

_____
QUINN-BRINTNALL, J.P.T.

FILED
COURT OF APPEALS
DIVISION II

2013 SEP 20  AM 9:57

STATE OF WASHINGTON

BY _____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41795-2-II |
| Respondent, | |
| v. | |
| ROBERT JOHN MADDAUS, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Robert John Maddaus appeals his jury trial convictions for first degree felony murder, first degree attempted kidnapping, second degree assault, and four counts of witness tampering; he also appeals his Persistent Offender Accountability Act[1] (POAA) life sentence and the firearm sentencing enhancements for his murder, attempted kidnapping, and assault convictions. He argues that (1) the warrant-based search of his residence was illegal; (2) the trial court violated his due process rights by allowing him to be restrained during trial; (3) the trial court committed several evidentiary errors[2]; (4) his counsel rendered ineffective assistance for

---

[1] RCW 9.94A.570.

[2] More specifically Maddaus challenges the trial court's restricting his cross-examination of a State witness (which he further asserts violated his right to confrontation), failure to hold an evidentiary hearing to address alleged governmental misconduct had occurred, and admission of recorded jail phone conversations.

No. 41795-2-II

several reasons[3]; (5) some of the trial court's jury instructions were erroneous[4]; (6) the State committed misconduct during closing argument[5]; (7) his two witness tampering convictions constituted double jeopardy, with insufficient evidence to support one of them; and (8) several sentencing errors warrant resentencing.[6]

In his Statement of Additional Grounds (SAG), Maddaus asserts that (1) the trial court erred in denying his request for new appointed counsel; (2) the trial judge was unfairly biased against him; (3) the State committed prosecutorial misconduct by displaying a Microsoft Power Point slide containing a photograph of Maddaus wearing a wig, with a circle and a slash superimposed over it and the word "GUILTY" written beneath it, CP at 978 ; and (4) cumulative

---

[3] More specifically, Maddaus contends that his trial counsel rendered ineffective assistance in failing to object to (1) the trial court's requiring that he wear restraints in court; (2) admission of recorded jail phone conversations; (3) prosecutorial misconduct during closing arguments; (4) jury instructions on "substantial step" and "deadly weapon"; and (5) a detective's statement bolstering Abear's testimony.

[4] More specifically, Maddaus challenges the trial court's refusal to instruct the jury on the lesser degree offense of third-degree assault, failure to instruct the jury that it must be unanimous about the alternative method used in committing the charged second degree assault and the first degree attempted kidnapping, and giving instructions on second degree assault and first degree attempted kidnapping that relieved the State of its burden to prove the essential elements of each crime.

[5] More specifically, Maddaus alleges that the prosecutor disparaged defense counsel; called the defense testimony "poppycock," "unreasonable under the law," and "crazy"; suggested that Maddaus had "duped" the defense investigator; and presented prejudicial power point slides. Br. of Appellant at 50-52.

[6] More specifically, Maddaus contends that his firearm sentencing enhancements violated his due process rights because the information charged him with only deadly weapon enhancements; the State failed to establish that he had two prior "strike" convictions for POAA purposes; and his POAA life sentence violated his equal protection and due process rights to a jury determination beyond a reasonable doubt that he had two prior qualifying convictions.

2

error violated his right to a fair trial.

We remand to the trial court to vacate and to dismiss either Count VI or Count VII (both witness tampering) with prejudice. We affirm Maddaus's other convictions and sentencing enhancements.

FACTS

I. CRIMES

A. First Degree Murder; Second Degree Assault

In the evening of November 13, 2009, Jessica Abear was sleeping in Maddaus's residence when a group of three to four persons kicked down the door and entered. One of the intruders ordered Abear to "[f]reeze" and held a gun to her head. 7 Verbatim Report of Proceedings (VRP) at 647. The intruders stole roughly $140,000 in drugs and cash.

When he returned home and learned about the robbery, Maddaus appeared "in a rage" and suspected that Abear had been involved. 7 VRP at 653. Attempting to elicit a confession, he hit her on the head with the butt of a firearm, sprayed her three times with mace, ripped off her clothes, and shot her ten times with a paintball gun. Maddaus then pointed the firearm at Abear's foot and threatened to shoot; but when he pulled the trigger, the firearm did not discharge. Abear told Maddaus that she thought his drug supplier might be a suspect in the robbery. Maddaus called his supplier, relayed what Abear had said, and mentioned that he (Maddaus) needed to "find someplace for [Abear] to go so that they [(Maddaus and his supplier)] could get the information out of [her]" and that he (Maddaus) "was going to torture it out of [her]." 7 VRP at 656. Abear managed to run out and take shelter in a neighbor's house until she was able to leave safely.

The next day, Maddaus discovered a tape recording that contained a recorded phone conversation of the persons involved in the robbery. Although most of the voices were unrecognizable, Maddaus believed that one was Shaun Peterson. Late the next evening, November 15, Maddaus met with Peterson and several friends (Matthew Tremblay, Jesse Rivera, Daniel Leville, and Falyn Grimes) to question Peterson about his involvement in the robbery. Peterson was handcuffed, and Maddaus was armed with a firearm and a knife. Nobody else was armed. While questioning Peterson, Maddaus played the recorded phone conversation. Peterson eventually walked out the front door; Maddaus followed him outside, after which Maddaus's friends reported hearing five rapid gunshots. Immediately following the shots, Matthew Tremblay saw Maddaus standing outside, pointing a firearm at Peterson, who ran a short distance before collapsing on the ground.

Early the following morning, November 16, Olympia police responded to a report of gunshots. They found Peterson on his back, having bled to death from multiple gunshot wounds. Police found four empty bullet casings and a cell phone near Peterson's body. The cell phone began to ring; the caller identified herself as Randi Henn, Peterson's girlfriend. Henn told the police that Peterson was involved in selling methamphetamine, that his drug source was Maddaus, and that Maddaus had recently been robbed and had asked to meet Peterson that night.

Several days later, police arrested Tremblay, who was believed to have been involved or to have knowledge about Peterson's murder. Tremblay told the police that (1) as he was placing items into Maddaus's vehicle, he had seen Peterson speaking with Maddaus outside the house and they had begun to argue; (2) Maddaus fired roughly five rounds from a firearm; (3) as the firing stopped, Tremblay looked up and saw Maddaus pointing a smoking firearm at Peterson;

4

No. 41795-2-II

(4) Tremblay and Maddaus fled to Josephine Lundy's residence, where they unloaded items into a large metal shipping container; and (5) Tremblay did not know what happened to the firearm that Maddaus had used to kill Peterson.

Tremblay later took the police to Lundy's property, where Lundy consented to a search of her residence and property; nothing of evidentiary value was found. Lundy also confirmed many of the details that Tremblay had provided, including that Maddaus had contacted Lundy in the early morning on the 16th of November.

Emerald Akau, who had been recently dating Maddaus, also spoke with police. She confirmed Maddaus's home address and stated that she had spent the night with him at his residence on the evening of November 16, the night after the murder.

The police obtained a search warrant for Maddaus's residence based on the information obtained during their investigation. This warrant authorized the police to search for: "[A]ny firearms, to include handguns, packaging for handguns, spent casings, new bullets, packaging for bullets," any "paintball guns, paintballs, marbles or items associated with paintball guns," and "handcuffs." Clerks Papers (CP) at 9. Executing the warrant, police found a paintball gun, a handgun and ammunition, and a set of handcuffs. They also detected the faint odor of pepper spray.

Meanwhile, Maddaus had acquired a wig and a false passport bearing the name "Chad Walker Vogt" and a photo of himself wearing a blond wig. 17 VRP at 2003. When asked why he had the wig, he stated, "Because I knew there was a warrant out for my arrest. The police wanted to talk to me. I didn't want to talk to them." 15 VRP at 1868. The police found this wig in Maddaus's vehicle when they arrested him.

5

## B. Witness Tampering

Theodore Farmer had worked with Maddaus selling methamphetamine. After Farmer was caught carrying methamphetamine in November 2009, he provided Maddaus's name to the Thurston County Drug Task Force, became an informant, and agreed to perform three controlled buys from Maddaus. On November 14 or 15, Farmer called Maddaus to purchase methamphetamine, but Maddaus did not answer. Maddaus called Farmer back later and stated, "I can't talk. I'll either be—I'll talk to you in person, or either that, or I'll be in jail." 10 VRP at 1240-41.

While awaiting trial in jail, Maddaus repeatedly telephoned his niece Chelsea Williams, Grimes, Leville, and Farmer, whom he called three times, to establish a false alibi. The jail actively monitored these calls.[7] During a three-way phone call with Williams and Farmer, Maddaus stated, "Here's the deal, right? These F***ing phones are recorded all the way." 11 VRP at 1476. Although Farmer initially agreed with Maddaus to provide false testimony, Farmer later changed his mind and contacted the police.[8]

---

[7] Before an inmate initiates a phone call, the phone system explains that the conversation will be monitored. A similar announcement is given to any party being dialed; that other party can either accept the phone call or press a button to decline.

[8] Farmer later testified that he decided to contact police "[b]ecause [he] had received a call after [Maddaus] had gotten arrested from the Thurston County Jail, and I knew that the phones were recorded." 10 VRP at 1247.

6

## II. PROCEDURE

The State charged Maddaus with first degree murder (alleging both premeditation and felony murder),[9] first degree attempted kidnapping, second degree assault of Abear (assault with a deadly weapon), and four counts of witness tampering (two based on his contacts with Farmer from the jail).[10] The first degree murder, attempted kidnapping, and assault charges each carried a sentencing enhancement allegation that "[Maddaus] was armed with a deadly weapon, a firearm." CP at 21-22.

### A. Pretrial Motions

#### 1. Search warrant; motion to suppress

Maddaus moved to suppress the search warrant of his residence, arguing lack of probable cause to authorize a search for firearms.[11] The trial court denied the motion, ruling that there was a sufficient nexus between the firearm sought and Maddaus's residence.

#### 2. Maddaus's letter

Several weeks before trial, the State received a letter through the mail with no return address. The prosecutor's receptionist opened the letter, reviewed it, and determined that it appeared to be correspondence from Maddaus to his defense attorney. The prosecutor's office

---

[9] The first degree murder charge was based on premeditation or, in the alternative, felony murder (during the attempted second degree kidnapping of Peterson).

[10] The State also charged Maddaus with two counts of first degree unlawful possession of a firearm. These separate firearm possession counts are not at issue in this appeal.

[11] More specifically, Maddaus stated, "[W]hat I'm concerned about is only the gun, nothing else that was taken out of the trailer." VRP (Aug. 12, 2010) at 58.

7

No. 41795-2-II

provided a copy of this letter to Maddaus's counsel. Maddaus alleged governmental misconduct, namely that someone at the jail had copied and mailed the letter to the prosecutor's office.[12]

Maddaus moved to continue the trial, to conduct a formal hearing to investigate how the letter came into the State's possession, and to dismiss. The prosecutor's sworn declaration in opposition stated:

> I directed ... the receptionist ... to not discuss with anyone whatever contents (of the letter) he may have seen, and to make a copy and dispatch it to defense counsel. I further directed that the original be kept, sealed, in the office until further order. I have not read what may or may not be a letter, or copy of a letter, written to [Maddaus's attorney].

CP at 283. At the hearing on Maddaus's motion, the prosecutor further explained,

> I told [the mail handler] I don't want to see it. I don't want to hear about it. Don't talk to anyone about it, and let's just freeze-frame this thing, seal it up, copy it, send a copy to [defense counsel] so he knows what's been going on, and seal it up because it might be ... evidence of wrongdoing. ...
>
> Now, Your Honor, consider the context of what's going on here. Mr. Maddaus, no stranger to the criminal justice system, fair to say con-wise, and familiar with the ways of manipulation, familiar with tampering with witnesses, we allege, who has violated court orders, who has been sitting in the jail for a year and comes up with a gimmick. And the gimmick is all I've got to do is send a copy of a letter or have somebody do it for me, and I can raise a ruckus and perhaps derail this prosecution.

VRP (Dec. 21, 2010) at 70. The trial court denied the motions to continue and to dismiss. VRP (Dec. 21, 2010) at 75.

---

[12] Maddaus based this allegation on the envelope's label and the address's having been written with a felt tip marker. According to Maddaus's counsel, the letter was a copy of correspondence that Maddaus had sent him months earlier, and it contained information that only Maddaus knew. At the subsequent hearing, Maddaus's attorney stated, "[I]t's my understanding that the inmates do not have access to the white labels. They do have access to those types of envelopes ... but not access to a felt tip pen." VRP (Dec. 21, 2010) at 55.

8

### 3. Potential impeachment

Maddaus moved in limine to be able to cross-examine Leville about his uncharged crimes to show bias. The trial court ruled that Maddaus could cross-examine Leville about his uncharged crimes, with or without a formal plea agreement. The trial court reserved ruling on the scope of cross-examination.

## B. Trial

### 1. Restraints

Over defense counsel's objection and without articulating its reasons, the trial court ordered Maddaus to wear a shock device and a leg restraint during trial. Before the jury entered, Maddaus's counsel told the trial court he was concerned that the jury would notice the leg restraint if Maddaus were asked to walk to the witness stand in the jury's presence. In response, the trial court allowed Maddaus to take the stand before the jury entered.

The next day, Maddaus's counsel again notified the court that Maddaus was wearing a shock device and that he was concerned that the jury might notice it. In response, the court arranged several tables to block the jurors' views of the shock device. Maddaus's counsel agreed with this arrangement and acknowledged that the jurors would not see his shock device.

The next week, Maddaus's counsel again notified the court that he believed the jurors could see the device on Maddaus's leg because he was "wearing more constrictive pants." 7 VRP at 628. The trial court placed several pieces of cardboard around Maddaus's table, which "look[ed] like exhibits," to block the jurors' views. 7 VRP at 629. Maddaus's counsel again agreed with this arrangement and acknowledged that the jurors would not see Maddaus's restraints.

9

No. 41795-2-II

## 2. Detective Johnstone's testimony

The State called Detective Chris Johnstone as a witness and asked whether he had interviewed Abear during his investigations. Johnstone replied that he had. When the State asked, "And the facts that she testified about, is that what you [previously] interviewed her about[?]," Maddaus objected on hearsay grounds, and the trial court sustained the objection. The State then rephrased the question, asking, "[T]he subject matter of your interview [with Abear], was it similar to her testimony here at trial?" Johnstone replied, "Yes, it was." 8 VRP at 825-26. Maddaus did not object to this rephrasing.

## 3. Leville's Cross-examination

Maddaus questioned Leville about several of his (Leville's) uncharged crimes, including heroin, methamphetamine, marijuana possession, and identity theft. Leville denied any knowledge of or involvement with these crimes. The State objected, arguing that these inquiries involved specific instances of alleged misconduct, contrary to ER 608. The trial court ruled:

> Evidence of character or conduct of a witness [f]or the purpose of attacking or supporting a witness's [credibility]—*other than convictions* of crime, which you have done, may not be proved by extenuating evidence. They may, however, in the discretion of the court, be probative as to truthfulness or untruthfulness. I have let you go on. . . . . I will not let you go into further specific incidents of conduct at this point.

10 VRP at 1129-30 (emphasis added).

## 4. Jury instructions

Maddaus requested a lesser degree offense jury instruction for either third or fourth degree assault. The trial court declined because "there [was] no evidence of criminal negligence

10

or assault in the fourth degree, that it's simply assault in the second degree or not guilty." 16 VRP at 1952.

For count I, first degree murder, the trial court instructed the jury on both premeditation and felony murder. For felony murder, Instruction 10 provided, "[O]n or about November 16, 2009 . . . the defendant was committing or attempting to commit the crime of kidnapping in the second degree." CP at 426. Instruction 10 further provided:

> If you find from the evidence that each of the elements in Alternative A [, premeditated murder,] or each of the elements in Alternative B [, felony murder,] has been proven beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. All of the elements of only one alternative need be proved. You must unanimously agree as to which one or more of the alternatives, A or B, has been proved beyond a reasonable doubt.

CP at 426.

For count IV, second degree assault, Instruction 17 provided, "An assault is an intentional touching or striking[, or] shooting of another person," or "an act . . . done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability," or "an act . . . done with intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury." CP at 433. The "to convict" instruction provided, "[O]n or about November 13, 2009, the defendant assaulted Jessica R. Abear with a deadly weapon." CP at 434 (Instruction 18). Instruction 30 stated, "A firearm, whether loaded or unloaded, is a deadly weapon." CP at 446. Finally, the "to convict" instruction for count III, Maddaus's first degree attempted kidnapping of Abear, provided, "[O]n or about November 13, 2009, the

11

defendant did an act that was a substantial step toward the commission of kidnapping in the first degree." CP at 437 (Instruction 21).

For counts I, III, and IV, the State sought special verdicts that "the defendant was armed with a deadly weapon at the time of the commission of the crime[s]." CP at 447 (Instruction 31). The special verdict instruction provided, "A pistol, revolver, or any other firearm is a deadly weapon whether loaded or unloaded." CP at 447 (Instruction 31). Other than requesting a lesser included offense instruction, Maddaus did not object to the trial court's instructions.

### 5. Closing arguments

During closing, the State argued:

> [Y]ou can consider the reasonableness of the witness's statements in the context of the other evidence. Consider, for example, Mr. Maddaus's testimony that he— what did he say? He asked to put the handcuffs on Mr. Peterson? And Peterson did? I mean, *that's poppycock. That's unreasonable under the law. That's crazy.* Nobody voluntarily puts handcuffs on themselves, and besides, we have evidence, of course, that Mr. Peterson was literally under the gun at the time the cuffs were put on him.
> [. . .]
> [C]ounsel for the accused argued that they—they worked hard, [Defense Counsel] worked real hard at finding witnesses. The evidence, however, ladies and gentlemen, the evidence about the defense witnesses suggests otherwise. . . . I'm not suggesting Mr. Wilson of wrongdoing; I'm just suggesting that [Defense Counsel], like Chelsea Williams, *was duped into being this defendant's agent.* 'I've got somebody that's got this information.' 'Oh, we'll go talk to that person.'"
> [. . .]
> Counsel for the accused's argument was a reminder of the distractions that sometimes people create when they're passengers in a vehicle. You're driving down the highway, and you're [focused] on paying attention to what's going on in front of you and keeping your eye on the rear-view mirror, and someone says, "Look over there. Look over there." That's what the argument was about. It was all about everything but the proof of Mr. Maddaus's guilt.
> [. . .]
> What you heard in the defense case, those witnesses from the defense in the defense argument, was the last gasp of this defendant, the last gasp, *the last effort*

12

No. 41795-2-II

> *to develop lies to try to convince you of what he's not, that he's innocent, and he's not.* The last gasp.

17 VRP at 1984, 2074-75, 2077 (emphasis added). Maddaus did not object to any of these statements.

The State also presented Microsoft PowerPoint slides during its closing argument. One slide depicted Maddaus wearing the wig that detectives had recovered from his vehicle. Surrounding the photo were capitalized captions describing various evidence used by the State, including: "JAIL PHONE CALLS," "FALSE ALIBI ATTEMPT," DISGUISE AND COVER-UP," "FUGITIVE," THREATS TO KILL," "MOTIVE," "TELEPHONE RECORDS," and "EYEWITNESS TO EVENTS." CP at 978. Each caption included an arrow pointing towards Maddaus's photo at the center, with the word "GUILTY" superimposed over his face. CP at 978. Maddaus did not object to this slide.

It appears that the State displayed this slide as the prosecutor made the following closing remarks:

> [Maddaus] adopted a disguise. He worked on a cover-up, and he worked like heck on this false alibi. I was in Tumwater. I was [getting] a tattoo. And the jail phone calls where he's pumping at Grimes and Leville. He's working on Theodore Farmer. He's working on Chelsea Williams because he's guilty and he's got to get out from underneath all that evidence. This defendant, ladies and gentlemen, this defendant, is the only one with motive, the only one with the means and the only one who is guilty of murder in the first degree. He is guilty of all the crimes alleged in the Information. He is guilty as charged, ladies and gentlemen, and guilty as proven.

17 VRP at 2015. Maddaus did not object to these statements.

13

No. 41795-2-II

### C. Conviction and Sentence

The jury found Maddaus guilty of (1) first degree felony murder, (2) two counts of unlawful possession of a firearm, (3) first degree attempted kidnapping, (4) second degree assault, and (5) four counts of witness tampering. The jury returned special verdicts for firearm enhancements on the first degree murder, attempted kidnapping, and second degree assault charges.

At sentencing, the State provided certified copies of Maddaus's criminal history.[13] When the court asked if there was any dispute as to his criminal history, Maddaus's attorney replied, "No, Your Honor, there's not." VRP (Feb. 8, 2011) at 124. Because of his prior "strike" offenses, the trial court sentenced Maddaus under the POAA, RCW 9.94A.570, to life without the possibility of early release. Maddaus appeals his convictions, POAA life sentence, and firearm sentencing enhancements.

### ANALYSIS

### I. SEARCH WARRANT

Appellate counsel argues in his brief and Maddaus asserts in his SAG that the State's search of Maddaus's residence was improper under the Fourth Amendment[14] and the Washington constitution because the affidavit in support of the search warrant lacked probable

---

[13] Among other crimes, Maddaus had previously been convicted of two prior "strike" offenses: possession of a controlled substance with intent to deliver while armed with a deadly weapon and second degree assault while armed with a deadly weapon.

[14] U.S. CONST. amend. IV.

14

cause. In the alternative, he argues for the first time on appeal that the search was unconstitutionally overbroad. These arguments fail.

A. Standard and Scope of Review

We review the issuance of a search warrant for abuse of discretion. *State v. Maddox*, 152 Wn.2d 499, 509, 98 P.3d 1199 (2004). But we give great deference to the issuing judge or magistrate's determination of probable cause. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). We find no abuse of discretion here.

A defendant waives the right to challenge the admission of evidence gained in an illegal search or seizure by failing to move to suppress the evidence at trial. *See State v. Mierz*, 127 Wn.2d 460, 468, 901 P.2d 286 (1995); *State v. McFarland*, 127 Wn.2d 322, 333-34, 899 P.2d 1251 (1995). We will not address such unpreserved alleged errors unless he can show that this issue meets the manifest constitutional exception of RAP 2.5(a)(3).[15] At trial, Maddaus moved to suppress only the firearm, alleging lack of probable cause. He did not seek to suppress any other items of evidence, the admissibility of which he now attempts to challenge for the first time on appeal.[16] Because he does not meet his burden to show that his new challenge falls within the

---

[15] A defendant may raise an argument for the first time on appeal only if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). An error is manifest if it has practical and identifiable consequences or causes actual prejudice to the defendant. *State v. Nguyen*, 165 Wn.2d 428, 433, 197 P.3d 673 (2008).

[16] Maddaus did not move below to suppress any other items now argued on appeal, such as clothing; notes and records to establish dominion and control; notes and records that relate to the distribution or sales of controlled substances; computers; media storage devices; cell phones; surveillance equipment; packaging for handcuffs and documentation or receipts for handcuffs; and drugs and paraphernalia.

RAP 2.5(a)(3) exception to the preservation requirement, we address only his preserved challenge to the firearm.

A valid search warrant requires probable cause. U.S. CONST. amend. IV; WASH. CONST. art. I, sec. 7. In order to establish probable cause, the supporting affidavit must provide sufficient facts to persuade a reasonable person that the defendant is probably engaged in criminal activity and that evidence of criminal activity probably can be found at the place to be searched. *State v. Lyons*, 174 Wn.2d 354, 359, 275 P.3d 314 (2012). Similarly, the affidavit must identify with particularity the place to be searched and the items to be seized. *Lyons*, 174 Wn.2d at 359. A court evaluates a search warrant affidavit "in a commonsense manner, rather than hypertechnically, and any doubts are resolved in favor of the warrant." *State v. Jackson*, 150 Wn.2d 251, 265, 76 P.3d 217 (2003).

### B. Affidavit of Probable Cause

The search warrant affidavit described Tremblay's account to police—that he had been present at the time of the shooting, that he had seen Maddaus pointing a firearm at Peterson immediately following the shots, and that he and Maddaus had gone to Lundy's residence. The affidavit also explained that a police search of Lundy's residence and property did not uncover any firearms and that Akau had told police that Maddaus had spent the following night after the shooting at his own residence.

The affidavit then summarized the evidence police expected to find at Maddaus's residence as follows:

> The residence that Maddaus[] went to immediately following the murder . . . is roughly one mile away from [his] residence. . . . We did not locate anything of evidentiary value to this investigation at [Lundy's residence]. It is believed that

the evidence of the crime to include the handgun used may be located at Maddaus'[s] address . . . as the result of the close location and the fact the evidence was removed from [Lundy's residence]. Therefore it is believed to have been removed and may be concealed in the home, mobile home[,] or outbuildings located at [Maddaus's address].

CP at 8.

Relying on *State v. Thein*, Maddaus argues that generalizations about the habits of criminals cannot provide sufficient probable cause to authorize a search. Br. of Appellant at 20 (citing *State v. Thein*, 138 Wn.2d 133, 148-49, 977 P.2d 582 (1999)). Maddaus is correct that (1) the search warrant in *Thein* "involve[d] nothing more than generalizations regarding the common habits of drug dealers and lack[ed] any specific facts linking such illegal activity to the residence searched"; and (2) it is not reasonable to infer that evidence is likely to be found in a certain location simply because police do not know where else to look for it. *Thein*, 138 Wn.2d at 148, 150. But the facts here are distinguishable from those in *Thein*, which, thus, does not apply.

Here, the affidavit contained two specific facts that provided probable cause to believe that the firearm used in the murder could be found at Maddaus's residence: (1) There was close physical proximity between Maddaus's residence and Lundy's residence, where Maddaus had visited immediately after the shooting; and (2) Maddaus had spent the night following the shooting at his residence, providing close proximity of time between the crime and the location to be searched. Here, the affidavit's provision for a firearm's search was not based on a *lack* of facts, as in *Thein*; nor was it based solely on an inference that the firearm's absence from one location (Lundy's nearby residence) necessarily permitted a search of another location (Maddaus's residence). *Thein*, 138 Wn.2d at 150. On the contrary, the affidavit recited a series of facts about Maddaus's location immediately following the shooting; it was reasonable to

17

assume that evidence of the crime could be recovered from his residence if not found in Lundy's, where he had gone before going home.

### C. Overbreadth Challenge not Properly before Us

Maddaus argues for the first time on appeal that the search warrant was overbroad in its use of the term "firearms" because the supporting affidavit did not suggest that "rifles, shotguns, or other long-barreled guns were involved in the crime." Reply Br. of Appellant at 9. We do not address the merits of this challenge because Maddaus failed both to preserve it for appeal and to establish an exception to RAP 2.5(a)(3)'s preservation requirements.

At the CrR 3.6 hearing below, Maddaus argued only that the search warrant authorizing the search for firearms was invalid for lack of probable cause; he did not argue that it was overbroad, as he now argues here. A defendant's motion to suppress must state a specific ground of objection. ER 103(a)(1). Even if the defendant objected at trial, he may assign error in the appellate court only on the specific ground of that evidentiary objection. *Dehaven v. Gant*, 42 Wn. App. 666, 669, 713 P.2d 149 (1986) (citing *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985); *State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976)). Thus, we do not address Maddaus's newly raised overbreadth argument unless he meets the preservation requirements of RAP 2.5(a)(3). Maddaus does not, however, argue that his new overbroad challenge is a manifest error affecting a constitutional right, justifying departure from the

preservation requirement of RAP 2.5(a)(3). Accordingly, we do not address his unpreserved alternative overbreadth challenge to the search warrant.[17]

## II. Restraints in Courtroom

Maddaus next argues that the trial court violated his due process rights by allowing him to be restrained at trial with a leg brace and shock device absent a showing of "impelling necessity" and that his counsel was ineffective in failing to object to these restraints. Br. of Appellant at 27. These arguments fail.

A defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances. *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999). Shackling or handcuffing infringes on a defendant's right to a fair trial for several reasons, including that it violates a defendant's presumption of innocence. *Finch*, 137 Wn.2d at 844. In order to protect the defendant's rights, the trial court must exercise discretion in determining the extent to which restraints are necessary to maintain order and to prevent injury, supported by a factual basis set forth in the record. *Finch*, 137 Wn.2d at 846 (citing *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981)). Nevertheless, a claim of unconstitutional shackling is subject to a harmless error analysis. *State v. Jennings*, 111 Wn. App. 54, 61, 44 P.3d 1 (2002) (citing *State v. Damon*, 144 Wn.2d 686, 692, 25 P.3d 418, 33 P.3d 735 (2001)).

Although the record does not reflect the trial court's reasons for restraining Maddaus, we hold that any error in doing so was harmless in light of the trial court's repeated efforts to

---

[17] We note that (1) no long-barreled guns were seized under the warrant, (2) he identifies no other evidence seized under the challenged portion of the warrant that was used to convict him, and (3) Maddaus does not point to any prejudice that flowed from the challenged language.

prevent any prejudice that might have flowed to Maddaus if the jury had seen these restraints. On multiple occasions before the jury returned to the courtroom, defense counsel notified the court about his concern that Maddaus's shock device or leg brace might be visible to the jury. Each time, the trial court accommodated Maddaus's requests by having him take the stand before the jury entered and by arranging the defense table in such a way as to block the jurors' view of Maddaus's restraints. Consequently, the record contains no evidence that any member of the jury ever saw these restraints and, thus, no possibility of prejudice to Maddaus.

We hold that, because the jury did not see Maddaus's restraints, there was no prejudice to him, and any error in ordering Maddaus to wear them was harmless. *Jennings*, 111 Wn. App. at 61. And because Maddaus fails to show prejudice, he also fails to show ineffective assistance where defense counsel initially objected to the restraints, persuaded the trial court to recognize a potential problem, and then worked with the court to block the jury's view of the restraints.[18]

### III. OTHER EVIDENTIARY ISSUES

Maddaus raises several evidentiary challenges, some for the first time on appeal. In general, we review a preserved trial court's evidentiary rulings for abuse of discretion. *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). A trial court abuses its discretion when it

---

[18] We review ineffective assistance of counsel claims de novo. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 490, 251 P.3d 884 (2010). In reviewing claims of ineffective assistance, we begin with a strong presumption that counsel was effective, including that counsel may have had legitimate strategic reasons for failing to object. *See, e.g., State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). A person claiming ineffective assistance of counsel has the burden to establish that counsel's performance both (1) was so deficient that it deprived the defendant of his constitutional right to counsel and (2) prejudiced the defendant's case. Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

bases its decision on untenable grounds or reasons. *State v. Thompson*, 173 Wn.2d 865, 870, 217 P.3d 204 (2012). If the defendant failed to preserve an evidentiary challenge with a specific objection below, we may address its merits for the first time on appeal if he establishes that the error is manifest and of constitutional magnitude for purposes of the RAP 2.5(a)(3) exception. We address each evidentiary challenge in turn; ultimately, all fail to provide grounds for reversal.

A. Leville's Cross-examination

Maddaus argues that the trial court violated his right to confrontation by restricting his cross-examination of Leville about the prosecutor's failure to charge Leville with various crimes. The cross-examination of a witness to elicit facts that tend to show bias, prejudice, or interest is generally a matter of right; but the scope or extent of such cross-examination is within the trial court's discretion. *State v. Roberts*, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980) (citing *State v. Robbins*, 35 Wn.2d 389, 213 P.2d 310 (1950)); *see also* ER 607, 611(b). A trial court may, in its discretion, reject cross-examination where the circumstances only remotely tend to show bias or prejudice, where the evidence is vague, or where the evidence is argumentative or speculative. *Roberts*, 25 Wn. App. at 834 (citing *State v. Jones*, 67 Wn.2d 506, 512, 408 P.2d 247 (1965)).

The record does not support Maddaus's contention that the trial court unconstitutionally restricted his cross-examination. On the contrary, the record shows that, in both its ruling in limine and at trial, the court allowed Maddaus to cross-examine Leville about a number of his uncharged crimes, including drug possession, flight risk, and identity theft.[19] Only after

---

[19] The following is an example of such cross-examination:
[Maddaus's counsel]: July you were picked up on a material witness warrant, but you were also picked up because Pretrial Services said you were attempting to take off, correct? You were going to go wherever the wind blew you?

permitting extensive questioning did the trial court sustain the State's objection and curtail Maddaus's continuing into other specific instances of misconduct for the reason that this evidence was not relevant under ER 608. Because this reason was not untenable, we hold that the trial court did not abuse its discretion in its limiting the scope of Leville's cross-examination during trial.

B. Evidentiary Hearing about State's Handling of Maddaus's Letter

In both his counsel's brief and his SAG, Maddaus contends that the trial court erred in denying his request for an evidentiary hearing to determine whether the State had engaged in

---

[Leville]: They said I was a flight risk, and that's what I did say to them. I said something to that effect.
[Maddaus's counsel]: And you were arrested at your place, correct?
[Leville]: At my home, yes.
[Maddaus's counsel]: And when you were arrested, you were found with some heroin; isn't that true?
[Leville]: No.
[Maddaus's counsel]: You were found with some methamphetamines; isn't that true?
[Leville]: No.
[Maddaus's counsel]: How about some marijuana?
[Leville]: No.
[Maddaus's counsel]: And identity theft.
[Leville]: No.
[Maddaus's counsel]: Nothing.
[Leville]: I wasn't—I wasn't arrested. I was at my home. I didn't have anything on me. I wasn't—when they pulled up on me, I had just—my friend had just driven away, and they pulled up. I didn't have anything on me, no.
[Maddaus's counsel]: It was in your vehicle though, wasn't it? A Volkswagen truck.
[Leville]: I believe they found something in my vehicle, yes.
[Maddaus's counsel]: Heroin, correct?"
10 VRP at 1126-27.

22

governmental misconduct after it received a copy of a letter that Maddaus had sent to his attorney. He also asserts in his SAG that he received ineffective assistance of counsel based on the trial court's denial of Maddaus's motion to continue to investigate potential governmental misconduct. We disagree.

We review for abuse of discretion a trial court's denial of an evidentiary hearing to investigate possible governmental misconduct. *See* CrR 8.3(a), (b). A trial court may abuse its discretion by failing to hold an evidentiary hearing when presented with an issue of fact requiring a determination of witness credibility. *Harvey v. Obermeit*, 163 Wn. App. 311, 327, 261 P.3d 671 (2011) (citing *Woodruff v. Spence*, 76 Wn. App. 207, 210, 883 P.2d 936 (1994)).

A defendant's right to counsel is protected by the federal and our state constitutions. U.S. CONST. amend. V, VI; WASH. CONST. art. I sec. 22. The constitutional right may be violated when the government wrongfully intercepts protected attorney-client communications. *State v. Cory*, 62 Wn.2d 371, 377, 382 P.2d 1019 (1963). After notice and hearing, the trial court may dismiss any criminal prosecution because of arbitrary action or governmental misconduct that has prejudiced a defendant's right to a fair trial if the defendant has shown governmental misconduct that resulted in prejudice affecting his right to a fair trial.[20] CrR 8.3(b); *State v. Garza*, 99 Wn. App. 291, 295, 994 P.2d 868 (2000) (citing *State v. Michielli*, 132 Wn.2d 229,

---

[20] In certain egregious cases, prejudice may be presumed. *See, e.g., Cory*, 62 Wn.2d at 372 (jail secretly recorded conversations between the defendant and his attorney); *State v. Perrow*, 156 Wn. App. 322, 326, 231 P.3d 853 (2010) (state detective wrongfully seized attorney-client writings during search of residence and delivered writings to the State's prosecution team); *State v. Granacki*, 90 Wn. App. 598, 600, 959 P.2d 667 (1998) (state detective read from defense counsel's legal pad during a court recess).

No. 41795-2-II

239-40, 937 P.2d 587 (1997)). Here, there was no showing of governmental wrongdoing or interference with Maddaus's attorney-client communications.

Unlike the facts in *Garza*,[21] Maddaus made no offer of proof to the trial court identifying any wrongdoing by the State in the prosecutor's receptionist's handling of his letter after receiving it in the mail. Rather, he asserts only that it was unlikely that he could have been responsible for his letter's reaching the prosecutor's office.[22] And although the trial court did not hold a full evidentiary hearing into the matter, it did conduct a hearing on Maddaus's motions, which revealed that, after the prosecutor's office discovered the letter was apparently from Maddaus to his attorney, the prosecutor sealed the original, without reading it, and turned over a copy to Maddaus's counsel.

We find no abuse of discretion in the trial court's handling of this issue. With respect to Maddaus's ineffective assistance of counsel claim, he fails to provide any facts or reasons about

___

[21] In *Garza*, jail officials seized and examined several defendants' legal documents after the defendants had attempted escape. One inmate witnessed one of the officers reading these legal materials. The trial court denied the defendants' motion to dismiss. *Garza*, 99 Wn. App. at 293-95. Division Three of our court held that the trial court had abused its discretion by denying the motion to dismiss without first holding an evidentiary hearing to determine whether the security concerns justified such an extensive intrusion into the defendants' attorney-client communications. *Garza*, 99 Wn. App. at 301. Division Three remanded for the trial court to conduct an evidentiary hearing, with instructions that if the defendants were able to establish that the jail officers' actions violated their right to counsel, the trial court "should fashion an appropriate remedy, recognizing that dismissal is an extraordinary remedy, appropriate only when other, less severe sanctions will be ineffective." *Garza*, 99 Wn. App. at 301-02.

[22] *See, e.g.*, Reply Br. of Appellant at 21:
> The attendant circumstances—including [Maddaus's] lack of access to a copy machine, the type of pen used, or the kind of envelope used, combined with the sheriff department's access to the letter—*suggest that the action was not taken by [Maddaus]*.

(Emphasis added).

24

why his counsel's performance was deficient or how counsel's performance prejudiced him.[23]

Thus, this claim also fails.

## C. Recorded Phone Conversations

For the first time on appeal Maddaus argues that the trial court erred in admitting recorded phone conversations between him and several individuals he had contacted through the jail's telephone system, allegedly in violation of the Washington "Privacy Act", chapter 9.73 RCW. Maddaus also argues that his trial counsel provided ineffective assistance in failing to object to the admission of these recorded phone conversations.

### 1. Failure to preserve issue for direct appeal

The Washington Privacy Act provides a statutory, not a constitutional, right. Because Maddaus failed to object to admission of these phone conversations at trial, he does not meet the manifest constitutional error exception to the preservation requirement of RAP 2.5(a)(3). Therefore, we do not further consider this issue directly. *See State v. Sengxay*, 80 Wn. App. 11, 15, 906 P.2d 368 (1995) (citing *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993)).

### 2. Ineffective assistance of counsel

Maddaus also collaterally challenges this evidence by alleging that his counsel's performance was deficient in failing to object to the admission of these recorded phone conversations, which, he claims violated Washington's Privacy Act. *See Strickland*, 466 U.S. at 687-88; *Hendrickson*, 129 Wn.2d at 77-78. In assessing whether counsel's performance was deficient, Maddaus must show that (1) counsel's failure to object fell below an objectives

---

[23] *Strickland*, 466 U.S. at 687-88; *Hendrickson*, 129 Wn.2d at 77-78.

standard of reasonableness, (2) the proposed objection would have been sustained, and (3) the result of the trial would have differed. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

Under Washington's Privacy Act, it is unlawful for any "individual, partnership, corporation, association, or the state of Washington . . . to intercept or record any [p]rivate communication transmitted by telephone . . . between two or more individuals . . . without first obtaining the consent of all the participants in the communication. RCW 9.73.030(1), (2). Our Supreme Court has recently held that recording an inmate's telephone conversations does not violate Washington's Privacy Act, which, by its own terms, applies only to "'[p]rivate communications." *State v. Modica*, 164 Wn.2d 83, 186 P.3d 1062 (2008) (quoting RCW 9.73.030(1)(a)). A "communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable." *Modica*, 164 Wn.2d at 88. Our Supreme Court concluded that, even if Modica had intended that his jail-recorded conversations be private, such expectation was not reasonable:

> First, we have already held that inmates have a reduced expectation of privacy. Second, both Modica and his grandmother knew they were being recorded and that someone might listen to those recordings. . . . He and his grandmother had to listen to an automated system's warning that the call will be "recorded and [is] subject to monitor at any time."
> [. . .]
> [B]ecause Modica was in jail, because of the need for jail security, and because Modica's calls were not to his lawyer or otherwise privileged, we conclude he had no reasonable expectation of privacy.

*Modica*, 164 Wn.2d at 88-89 (internal citations omitted).

The jail phone system plays a recorded announcement to both the party dialing and the party receiving a phone call that all conversations are monitored. Maddaus was aware of this

26

fact: During a three-way phone call with Williams and Farmer, Maddaus stated, "Here's the deal, right? These F***ing phones are recorded all the way." 12 VRP at 1476. In a separate phone call, Maddaus spoke with Williams, who in turn handed the phone to Grimes, who then handed it to Leville. Maddaus argues that because the phone system did not replay the recorded message to Farmer, Leville, and Grimes, they did not consent to the State's recording these conversations.

This argument is not a persuasive reason for excluding these conversations under the Act. Regardless of who heard or did not hear the warnings, Maddaus, as well as the other parties he joined[24] into the conversation, had no reasonable expectation of privacy. *Modica*, 164 Wn.2d at 89. All parties knew that Maddaus was phoning them from jail. Because the reasonableness test is an objective one, we hold that any general expectation that jail-initiated phone calls would be private was not reasonable. *See Modica*, 164 Wn.2d at 89. In particular, before engaging Farmer in this phone call from jail, Maddaus expressly put him on notice that their phone conversation was being recorded. Williams, Leville and Grimes each knew that Maddaus was calling from jail; but even if they did not hear Maddaus's admonition to Farmer that the

---

[24] Maddaus cites *State v. Williams*, 94 Wn.2d 531, 548, 617 P.2d 1012 (1980), to support his arguments that (1) "[a]n accused person has standing to object to the admission of any illegally recorded conversation, even if his or her privacy rights were not personally violated"; and (2) because certain parties to the recorded conversation did not hear the recorded "monitoring" message, Maddaus had standing to object to admission of these conversations on their behalf. Br. of Appellant at 45-47. We reject Maddaus's contention that he has standing to assert a violation of the Privacy Act on behalf of Williams, Leville, Grimes, or Farmer; moreover, the facts here show clearly that Maddaus invited these people into the conversation, knowing that the phone calls were being recorded. Thus, we do not further address whether their rights were violated.

27

conversation was being recorded, the participation of multiple parties diminished the privacy of this second call. *See State v. Christensen*, 153 Wn.2d 186, 193, 102 P.3d 789 (2004).[25]

Because none of the phone conversation participants had reasonable expectations of privacy, the conversations did not violate Washington's Privacy Act and Maddaus's counsel's performance was not deficient when he failed to object to the conversations' admission into evidence on these grounds. We hold, therefore, that Maddaus fails to establish that his counsel rendered ineffective assistance. *Strickland*, 466 U.S. at 687-88.

D. Detective Johnstone's Testimony

Maddaus next argues that he received ineffective assistance from his counsel when he failed to object to Detective Johnstone's testimony, which Maddaus claims was inadmissible hearsay that bolstered Abear's testimony. This argument fails.

First, Maddaus fails to show the deficient performance prong of the ineffective assistance counsel test because the challenged testimony was not hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Generally, hearsay is not admissible. ER 802. Here, the State asked Johnstone, "[T]he facts that [Abear] testified about, is that what you [previously] interviewed her about[?]" 8 VRP at 825-26. When Maddaus objected on hearsay grounds, and the trial court sustained the objection, the State rephrased the

---

[25] When determining whether an expectation of privacy is reasonable, we consider several factors, including but not limited to: (1) the duration and subject matter of the communication, (2) the location of the parties, (3) the potential presence of third parties, (4) the role of the interloper, and (5) the interloper's relationship to the nonconsenting party. *Christensen*, 153 Wn.2d at 193 (citing *State v. Clark*, 129 Wn.2d 211, 225, 916 P.2d 384 (1996)). Here, there was no reasonable expectation of privacy for several of these reasons, including the actual known presence and participation of third parties.

question to ask, "[T]he subject matter of your interview [with Abear], was it similar to her testimony here at trial?" Johnstone replied, "Yes, it was." 8 VRP at 826.

Defense counsel did not again object that this rephrased question and response involved hearsay because they neither elicited nor presented an out-of-court statement offered to prove the truth of Abear's testimony. Instead, the rephrased question and answer focused on whether there was overlap between the subject of Johnstone's interview of Abear and her trial testimony. Nor did this rephrased question and answer invite Johnstone to corroborate Abear's testimony. Because there was no hearsay involved, defense counsel's performance was not deficient for failing to object on this ground.

## IV. JURY INSTRUCTIONS

Maddaus next asserts reversible error on several instructional grounds, none of which we find persuasive. Some issues he has preserved for appeal; some he has not. We address each in turn.

### A. General Standard of Review

In general, jury instructions are proper if they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law. *State v. Hayward*, 152 Wn. App. 632, 641, 217 P.3d 354 (2009). It is generally reversible error for the trial court to refuse a proposed instruction that states the proper law and that the evidence supports. *State v. Ager*, 128 Wn.2d 85, 93, 904 P.2d 715 (1995); *State v. Staley*, 123 Wn.2d 794, 803, 872 P.2d 502 (1994). We review de novo alleged errors of law in jury instructions. *State v. Porter*, 150 Wn.2d 732, 735, 82 P.3d 234 (2004); *Boeing Co. v. Key*, 101 Wn. App. 629, 632, 5 P.3d 16 (2000). We analyze a challenged jury instruction by considering the instructions

together as a whole and reading the challenged portions in context. *Hayward*, 152 Wn. App. at 642.[26] Failure to object below, however, usually waives an issue on appeal, including instructional error issues. RAP 2.5(a); *State v. Williams*, 159 Wn. App. 298, 312-13, 244 P.3d 1018, *review denied*, 171 Wn.2d 1025 (2011).

### B. Lesser Degree Assault Instruction

Maddaus unsuccessfully argues that the trial court erred in refusing to instruct the jury on the lesser degree offense of third degree assault.[27] An instruction on an inferior degree offense is proper when

> (1) the statutes for both the charged offense and the proposed inferior degree offense "proscribe but one offense"; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense.

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)). The State concedes, and we agree, that third degree assault is an inferior degree of second degree assault.

Our focus then is whether the evidence raised an inference that Maddaus committed *only* the lesser degree offense. *Fernandez-Medina*, 141 Wn.2d at 455. "[T]he evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." *Fernandez-Medina*, 141 Wn.2d at 456 (citing *State v.*

---

[26] *See also State v. Teal*, 117 Wn. App. 831, 837, 73 P.3d 402 (2003) (citing *State v. Haack*, 88 Wn. App. 423, 427, 958 P.2d 1001 (1997), *review denied*, 134 Wn.2d 1016 (1998)), *aff'd*, 152 Wn.2d 333, 96 P.3d 974 (2004).

[27] Maddaus does not challenge the trial court's denial of Maddaus's request for an instruction on fourth degree assault.

30

*Fowler*, 114 Wn.2d 59, 67, 785 P.2d 808 (1990), *overruled on other grounds by State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991)). RCW 9A.36.031[28] provides, in relevant part, that a person commits third degree assault when he, with criminal negligence, causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm, or causes bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering. RCW 9A.36.031(1)(d), (f).

At trial, Maddaus testified that he grabbed the mace from Abear's hands and that it inadvertently went off, spraying them both. In his appellate brief, Maddaus denies that he assaulted Abear with a handgun or a paintball gun; he then argues that his trial testimony did not mention the use of any firearm or paintball gun against Abear. In short, Maddaus's theory of the case is that *there was no assault*, not that he committed only the inferior degree offense. Moreover, his argument relies entirely on the jury's disbelieving certain parts of Abear's testimony that pointed to second degree assault but accepting other parts of her testimony that would point to third degree assault. The Supreme Court previously rejected this analysis in *Fernandez-Medina*, 141 Wn.2d at 456 (The evidence must affirmatively establish the defendant's theory of the case; it is not enough that the jury might disbelieve the evidence pointing to guilt). Thus, we hold that the trial court did not err in denying Maddaus's request for an inferior degree instruction.

---

[28] The legislature has since amended RCW 9A.36.031 in ways that are not relevant to this case. Accordingly, we cite the current version of the statute, LAWS OF 2011, ch. 238, § 1; LAWS OF 2013, ch. 256, § 1.

No. 41795-2-II

## C. Unanimity on Elements

Maddaus also argues that the trial court unconstitutionally relieved the State of its burden to prove the essential elements of each crime when it failed to instruct the jury that it must be unanimous about (1) the weapon used in the second degree assault sentencing enhancement, and (2) the victim in the first degree attempted kidnapping charge.[29] These arguments also fail.

Maddaus first argues that he was entitled to an instruction that the jury had to be unanimous about the weapon used in the second degree assault for the sentencing enhancement special weapon verdict because some jurors could have voted for the enhancement based on his assaulting Abear with mace and others could have focused on either the paintball gun or the handgun. This argument contravenes the clear jury instructions, which stated that Maddaus assaulted Abear with a "deadly weapon," defined as a "firearm, whether loaded or unloaded." CP at 434 (Instruction 18), 446 (Instruction 30). Because we presume the jury followed the trial court's instructions,[30] they could not have considered the non-firearm mace or paintball gun as deadly weapons.

---

[29] Generally, when the State offers evidence of multiple acts, and any of those acts could support one count, either "the State must designate the acts upon which it relies to prove its case" or "the court may instruct the jury to agree unanimously as to which acts support a specific count." *State v. Fisher*, 165 Wn.2d 727, 755, 202 P.3d 937 (2009) (citing *State v. Petrich*, 101 Wn.2d 566, 570, 683 P.2d 173 (1984), *modified on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988)).

But a unanimity instruction is not required when the State offers evidence of multiple acts in a "continuing course of conduct." *State v. Crane*, 116 Wn.2d 315, 326, 804 P.2d 10 (1991). "A continuing course of conduct requires an ongoing enterprise with a single objective." *State v. Love*, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). This determination requires a commonsense evaluation of the facts. *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989).

[30] *State v. Perez-Valdez*, 172 Wn.2d 808, 818-19, 265 P.3d 853 (2011).

32

Second, Maddaus argues that because the first degree attempted kidnapping charge did not name Abear as the victim, the jury could have convicted Maddaus of second degree assault based on his attempted kidnapping of Peterson instead of Abear. The record, however, does not support this possibility: During closing, the State argued,

> The judge also tells you what the completed crime of kidnapping in the first degree is. Keep in mind, ladies and gentlemen, the charge is attempted kidnapping. Jessica Abear was not kidnapped, but the evidence shows that that's what the defendant had in mind, and he took a substantial step towards the commission of that crime. . . . The issue is what did the defendant have in mind when he confronted, and I submit, tortured Jessica Abear.

17 VRP at 1992. We hold, therefore, that that Maddaus fails to show reversible error in the trial court's burden of proof instructions.

### D. State's Burden To Prove Each Element

Maddaus next argues for the first time on appeal that (1) the trial court failed to define "deadly weapon" for his second degree assault charge, (2) the trial court gave an erroneous instruction on "substantial step" on his first degree attempted kidnapping charge, and (3) these errors unconstitutionally relieved the State of its burden of proof at trial. Br. of Appellant at 75, 77. He also argues that his counsel's failure to object below constituted ineffective assistance. These arguments also fail, both in meeting the RAP 2.5(a)(3) preservation exception and on the merits (which latter issue overlaps with the "manifest" component of the preservation exception test and the prejudice prong of the ineffective assistance of counsel test).

Due process requires the State to prove every element of an offense beyond a reasonable doubt. U.S. CONST. amend. XIV; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Jury instructions that relieve the State of its burden to prove every element of an

offense violate due process. *State v. Thomas*, 150 Wn.2d 821, 844, 83 P.3d 970 (2004), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Thus, such errors affect a constitutional right and may be raised for the first time on appeal if the defendant also shows the errors were "manifest" under RAP 2.5(a)(3).

> The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights; it is this showing of *actual prejudice* that makes the error "manifest."

*McFarland*, 127 Wn.2d at 333 (emphasis added). Maddaus fails to meet this "manifest" prong of the RAP 2.5(a)(3) test.

### 1. "Deadly weapon"

As we have already discussed, the trial court adequately instructed that in order to convict on Count IV, the jury was required to find that "on or about November 13, 2009, [Maddaus] assaulted Jessica R. Abear *with a deadly weapon*." CP at 434 (Instruction 18) (emphasis added). The trial court also narrowed the jury's consideration of deadly weapon in Instruction 30 to a "firearm, whether loaded or unloaded." CP at 446 (Instruction 30). Again, we presume the jury followed these instructions.[31] Therefore, we hold that, in narrowing the jury's consideration to the firearm, the jury instructions did not relieve the State of its burden to prove Maddaus

---

[31] *Perez-Valdez*, 172 Wn.2d at 818-19.

assaulted Abear with a deadly weapon[32]; thus, Maddaus shows neither error nor prejudice.

### 2. "Substantial step"

Similarly, Maddaus fails to show that the trial court's instructions about the "substantial step" element of first degree attempted kidnapping relieved the State of its burden to prove each element of this crime. Br. of Appellant at 77. In addition, an instruction on the definition of "substantial step," Instruction 22 provided, "A substantial step is conduct that strongly *indicates* a criminal purpose and that is more than mere preparation." CP at 438 (emphasis added). Maddaus argues that this definition is a lower standard than that in *State v. Workman*, which stated, "[I]n order for conduct to be a substantial step it must be *strongly corroborative* of the actor's criminal purpose." *State v. Workman*, 90 Wn.2d 443, 452, 584 P.2d 382 (1978) (emphasis added). Maddaus argues that "corroborative" is a stronger word than "indicates" and that "the" criminal purpose is a more narrow consideration than "a" criminal purpose. Br. of Appellant at 77-78.

Washington courts have used the terms "corroborative of" and "indicates" interchangeably without criticism; and Maddaus cites no cases to the contrary. *See, e.g., State v. Dent*, 67 Wn. App. 656, 660, 840 P.2d 202 (1992), *aff'd*, 123 Wn.2d 467, 869 P.2d 392 (1994)

---

[32] For the first time in his reply brief, Maddaus also argues that "[n]othing in this case established that the weapon allegedly used to assault Abear was a real gun, as opposed to a toy gun." Reply Br. of Appellant at 42. We do not consider an issue raised and argued for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Moreover, Maddaus provides no further argument or authority to support this claimed error. RAP 10.3(a)(6); *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 345, 779 P.2d 249 (1989) (courts need not consider issues unsupported by adequate argument and authority). Thus, we do not consider its merits.

(using "indicates a criminal purpose"); *State v. Aumick*, 126 Wn.2d 422, 427-28, 894 P.2d 1325 (1995) (using "corroborative of the actor's criminal purpose").

Furthermore, Maddaus incorrectly reads Instruction 22 in isolation, contrary to the well-settled rule that we must read jury instructions together as a whole. *Hayward*, 152 Wn. App. at 642; *State v. Teal*, 117 Wn. App. 831, 837, 73 P.3d 402 (2003). Instruction 20 provides, "A person commits the crime of attempted kidnapping in the first degree when, *with intent to commit that crime*, he or she does any act that is a substantial step *toward the commission of that crime*." CP at 436 (Instruction 20) (emphasis added). Read together, these two instructions clearly required the jury to find evidence demonstrating that Maddaus took a substantial step toward committing first degree attempted kidnapping in order to convict him of that charge. Thus, Maddaus cannot show deficient performance by defense counsel in failing to object to the trial court's proper instructions. We hold that the trial court's instructions did not relieve the State of its burden of proof and that defense counsel did not provide ineffective assistance in failing to object to these instructions.

## V. PROSECUTORIAL MISCONDUCT

Maddaus next argues that the State committed various acts of prosecutorial misconduct during closing argument. He did not, however, preserve any of these arguments with timely objections below. Some he now casts in the context of ineffective assistance of counsel arguments. We address each of Maddaus's claims in each turn; none provide grounds for reversal.

No. 41795-2-II

## A. Standards of Review[33]

A defendant has a fundamental right to a fair trial, secured by the right to counsel, guaranteed by the Sixth and Fourteenth Amendments and article I, section 22 of the Washington State Constitution.[34] *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); *State v. Finch*, 137 Wn.2d 792, 843, 975 P.2d 967 (1999). Generally, a prosecutor has wide latitude to argue reasonable inferences from the evidence. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Nevertheless, prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). The term "fair trial" implies a trial in which the prosecuting attorney does not throw the prestige of his public office or the expression of his own belief of guilt into the scales against the accused. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (citing *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011)). For example, the prosecutor should not use arguments calculated to inflame the passions or prejudice of the jury. *Glasmann*, 175 Wn.2d at 704.

A defendant must satisfy two requirements to prevail on a claim of prosecutorial misconduct: He must establish that (1) the prosecutors conduct was improper, and (2) the conduct was prejudicial in the context of the entire record and the circumstances at trial. *Thorgerson*, 172 Wn.2d at 438. To establish prejudice, the defendant must show a substantial

---

[33] We have previously stated the applicable standard of review for ineffective assistance of counsel claims. *See* n.18.

[34] U.S. CONST. amend. VI and XIV; WASH. CONST. art. I, § 22.

likelihood that the misconduct affected the jury verdict. *Glasmann*, 175 Wn.2d at 704 (citing *Thorgerson*, 172 Wn.2d at 438).

A party's failure to object to improper prosecutorial statements at trial constitutes a waiver on appeal unless that party shows the statement was "'so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). Even if the trial court could have cured the prejudice with a jury instruction, if the defense did not request such an instruction, reversal is not automatically required. *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Rather, the burden on the defendant heightens to show that the misconduct was so flagrant and ill-intentioned that an instruction would not have cured the prejudice. *Thorgerson*, 172 Wn.2d at 438.

This heightened standard of review requires the defendant to show that (1) no curative instruction would have cured any prejudicial effect on the jury, and (2) the misconduct resulted in prejudice that "'had a substantial likelihood of affecting the jury verdict.'" *State v. Lindsay*, 171 Wn. App. 808, ___, 288 P.3d 641, 650 (2012) (quoting *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012)). We assess the claimed misconduct by the effect *likely* to have flowed from it, focusing more on whether an instruction *could have cured* the misconduct. *Emery*, 174 Wn.2d at 762. In so doing, we inquire whether the misconduct engendered "'a feeling of prejudice'" that would have prevented a fair trial absent a curative instruction. *Emery*, 174 Wn.2d at 762 (quoting *Slattery v. City of Seattle*, 169 Wn. 144, 148, 13 P.2d 464 (1932)).

### B. Disparaging Defense Counsel

Maddaus argues, also for the first time on appeal, that the prosecutor infringed on his constitutional right to counsel by disparaging the role of defense counsel and impugning counsel's integrity when the prosecutor (1) claimed that defense counsel's investigator had been "duped," (2) compared defense counsel's argument to "the distractions that sometimes people create when they're passengers in a vehicle," and (3) stated that what the jury heard from the defense's witnesses were "the last effort to develop lies." Br. of Appellant at 50, 51. Maddaus further argues that he received ineffective assistance based on his counsel's failure to object to this alleged prosecutorial misconduct. Maddaus correctly notes that it is improper for the prosecutor to comment disparagingly on defense counsel's role or to impugn the defense lawyer's integrity. *Thorgerson*, 172 Wn.2d at 451.[35] But this did not happen here.

Here, the State neither disparaged counsel nor accused him of wrongdoing when it suggested that defense counsel's investigator had been "duped" into being Maddaus's agent. There was no insinuation of misconduct or lack of integrity on the part of defense counsel; nor did this statement impugn defense counsel. Rather, the statement focused on the defense investigator; and even then, it did not actually disparage him by suggesting that he had been "duped" by some external event or person. The same holds true for the prosecutor's second challenged statement—that defense's witnesses had engaged in a "last effort to develop lies." 17 VRP at 2077. This statement similarly did not call defense counsel's integrity into question.

---

[35] *Thorgerson* held it was improper for the prosecutor to describe defense counsel's tactics as "sleight of hand" because it "implies wrongful deception or even dishonesty in the context of a court proceeding." *Thorgerson*, 172 Wn.2d at 451-52.

Rather, the State was articulating reasons why the jury should find that the defense *witnesses* were not telling the truth.

The record does not support Maddaus's argument that the prosecutor committed misconduct in this way. In short, he shows no prejudice; thus, Maddaus also fails to establish both reversible error and ineffective assistance of counsel for failing to object to these comments.

### C. "Poppycock," "Unreasonable," "Crazy," "Duped"

Maddaus next argues that the State committed prosecutorial misconduct during closing arguments by calling defense testimony "'poppycock,'" "'unreasonable under the law,'" and "'crazy,'" and suggesting that Maddaus had "'duped'" the defense investigator. Br. of Appellant at 49 (quoting 17 VRP at 1984, 2074). We find *State v. Copeland* instructive: There, the prosecutor told the jury, "[Y]ou'll find as a jury that [Copeland] lied when he took the stand," and he suggested that Copeland was "lying" when he made several other statements (based on contradictory testimony from other witnesses). *State v. Copeland*, 130 Wn.2d 244, 291-92, 922 P.2d 1304 (1996). Our Supreme Court held the prosecutor's argument was not improper because he was arguing inferences from the evidence; it also held that "a curative instruction would have neutralized any prejudice." *Copeland*, 130 Wn.2d at 291-92.

The statements at issue here were more flagrant and ill-intentioned than those in *Copeland*, but Maddaus fails to show that they rose to the level of being "so flagrant and ill-intentioned" that they, too, could not have been neutralized by a curative instruction. *Dhaliwal*, 150 Wn.2d at 578. Thus, we do not further consider the merits of his challenge for the first time on appeal.

40

To the extent that Maddaus also argues that his trial counsel was ineffective for failing to object to these comments, we note that defense counsel may have had strategic reasons for not objecting to these comments, such as preferring not to draw the jury's attention to them. *See Grier*, 171 Wn.2d at 32-33; *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989) ("The decision of when or whether to object is a classic example of trial tactics.").

### D. PowerPoint Slide

Maddaus also argues for the first time on appeal that (1) the State engaged in prosecutorial misconduct when it displayed a Microsoft PowerPoint slide containing a photograph of Maddaus wearing a wig police had found in his vehicle, the word "GUILTY" written beneath it, and other similar words surrounding it; and (2) his counsel was ineffective in failing to object. These arguments also fail.

Our Supreme Court recently reversed a guilty verdict and remanded for a new trial after the prosecuting attorney made a sequential electronic slide presentation to the jury graphically displaying his personal opinion that the defendant was "guilty, guilty, guilty" of the charged crimes. *Glasmann*, 175 Wn.2d at 699. The Supreme Court described these slides as follows:

> In one slide, the booking photo appeared above the caption, "DO YOU BELIEVE HIM?" In another booking photo slide the caption read, "WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?" Near the end of the presentation, the booking photo appeared three more times: first with the word "GUILTY" superimposed diagonally in red letters across [the defendant]'s battered face. In the second slide the word "GUILTY" was superimposed in red letters again in the opposite direction, forming an "X" shape across [the defendant]'s face. In the third slide, the word "GUILTY," again in red letters, was superimposed horizontally over the previously superimposed words.

*Glasmann*, 175 Wn.2d at 701-02 (internal citations omitted). Glasmann failed to object, just as Maddaus failed to object to here. *Glasmann*, 175 Wn.2d at 700, 702.

41

No. 41795-2-II

Nonetheless, on appeal, the Supreme Court held that the prosecutor's "including alterations of [the defendant]'s booking photograph by addition of highly inflammatory and prejudicial captions constituted flagrant and ill intentioned misconduct." *Glasmann*, 175 Wn.2d at 714. The Court further noted, "[S]howing Glasmann's battered face and superimposing red capital letters" added to the prejudice. *Glasmann*, 175 Wn.2d at 708 (citing *State v. Gregory*, 158 Wn.2d 759, 866-67, 147 P.3d 1201 (2006)). The Court believed there was a substantial likelihood that the misconduct affected the jury because "[t]he mental state required for the charged offenses, specifically intent, was critically important" and the nuanced distinctions posed a "serious danger that the nature and scope of the misconduct here may have affected the jury." *Glasmann*, 175 Wn.2d at 708, 710.

The circumstances in *Glasmann*, however, differed significantly from those here. Glasmann was charged with first degree assault, attempted first degree robbery, first degree kidnapping, and obstruction. *Glasmann*, 175 Wn.2d at 700. Glasmann did not deny culpability; rather, he disputed the degree of the crimes charged. *Glasmann*, 175 Wn.2d at 700. Maddaus was charged with first degree murder; but, in contrast with Glasmann, Maddaus adamantly denied culpability. Maddaus's theory of the case was that he did not commit the murder, not, like Glasmann, that he committed only a lesser degree of the charged crime.

Moreover, the center of this single slide included a photograph of Maddaus (not a mug shot, as in *Glasmann*) wearing a wig—to remind the jury that Maddaus had intentionally obtained a false passport and had been using a disguise on the days leading to his arrest. In contrast, nothing in the record here suggests that the State used this slide to trigger "an emotional reaction" from the jury, as was the case in *Glasmann*, where mulitiple PowerPoint slides

42

repeatedly displayed Glasmann's mug shot, displaying him as unkempt and bloody. *Glasmann*, 175 Wn.2d at 706; 710 n.4.

Applying the heightened standard of scrutiny for unpreserved errors, we hold that Maddaus has failed to show that a curative instruction would not have overcome any prejudicial effect from the State's use of this single slide showing him in a wig that he had used to evade arrest. Moreover, as with the previous claim, defense counsel could have strategically elected not to object to this slide to avoid emphasizing it further; this point, coupled with Maddaus's failure to show prejudice, defeats his ineffective assistance claim on this basis.

## VI. WITNESS TAMPERING

Maddaus next argues that (1) his two witness tampering convictions, Counts VI and VII, based on his multiple contacts with Farmer to persuade him to provide a false alibi, constituted, "(at most) one unit of witness tampering" and, consequently, double jeopardy under the Fifth and Fourteenth amendments[36] and the Washington constitution, art. I, sec. 9; and (2) there was insufficient evidence to support his witness tampering convictions on Counts VI and VII because the State failed to prove that Farmer was a witness, was about to be called as a witness, or was in possession of information relevant to a criminal investigation at the time of the alleged tampering. Br. of Appellant at 54. The State concedes, and we agree, that these two counts constituted one unit of prosecution. We further hold that the evidence is sufficient to show that Farmer was a potential witness; therefore, Maddaus's challenge on this ground fails.

---

[36] U.S. CONST. amend. V; XIV.

No. 41795-2-II

A. Double Jeopardy; Single Unit of Prosecution

An appellant may raise a double jeopardy claim for the first time on appeal; and we review it de novo. *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006) (citing RAP 2.5(a)); *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010) (citing *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010)). A defendant may face multiple charges arising from the same conduct, but double jeopardy prohibits multiple convictions for the same offense.[37] *State v. Hall*, 168 Wn.2d 726, 729-30, 230 P.3d 1048 (2010).

Washington's witness tampering statute provides in relevant part:

(1) A person is guilty of tampering with a witness if he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding ... to:
(a) Testify falsely or, without right or privilege to do so, to withhold any testimony.

RCW 9A.72.120(1), (a). Addressing this statute in *Hall*, our Supreme Court held that (1) "[a] unit of prosecution can be either an act or a course of conduct"; and (2) the evil the legislature has criminalized is the attempt "to induce a witness" not to testify or to testify falsely, rather than the number of attempts, "whether it takes 30 seconds, 30 minutes, or days." *Hall*, 168 Wn.2d at 731. We have similarly held that a defendant's numerous telephone calls to a potential witness to recant her testimony was a continuing course of conduct aimed at the same witness in a single proceeding, amounting to only one unit of witness tampering. *State v. Thomas*, 158 Wn. App. 797, 802, 243 P.3d 941 (2010). The State concedes, and we agree, that Maddaus's repeated phone calls to persuade Farmer to testify falsely constituted one unit of prosecution and should

---

[37] The Fifth Amendment of the United States Constitution and Washington Constitution article I, section 9 guarantee that "[n]o person shall be ... twice put in jeopardy" for the same offense.

44

result in only one conviction for witness tampering based on his contacts with Farmer in order to prevent double jeopardy.[38]

### B. Sufficient Evidence To Support Single Count

In determining the sufficiency of the evidence to support Maddaus's challenged witness tampering convictions, we view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Townsend*, 147 Wn.2d 666, 679, 57 P.3d 255 (2002). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Applying these standards here, we hold that the evidence is sufficient to show that Farmer was a potential witness.

Farmer had previously agreed to act as an informant for Thurston County and to perform three controlled buys; he had provided the drug unit with Maddaus's name, and he had called Maddaus on November 15, 2009, to purchase methamphetamine in a controlled buy. Police obtained phone records of all calls placed and received from Maddaus's cell phone, which included a record of his phone call to Farmer. We agree with the State that, in this context, Farmer was a potential witness by virtue of his prior arrangements with the police to set up a controlled buy with Maddaus and Farmer's subsequent phone calls to Maddaus's cell phone for

---

[38] We note that the legislature has since amended the tampering statute, adding subsection (3), which states, "For purposes of this section, each instance of an attempt to tamper with a witness constitutes a separate offense." RCW 9A.72.120. LAWS OF 2011, ch. 165, § 3. Because the statute was amended after Maddaus attempted to persuade Farmer to testify falsely, it does not apply here.

this purpose on the days immediately preceding or following the murder. Taking this evidence in the light most favorable to the State, as we must, we hold that the evidence and the double jeopardy prohibition support a single conviction for witness tampering based on Maddaus's attempt to persuade Farmer to provide false testimony, namely *either* Count VI *or* Count VII, but not both.[39]

## VII. SENTENCING

### A. Firearm Enhancements

Maddaus next argues, for the first time on appeal, that his firearm sentencing enhancements on Counts I, III, and IV violated his due process rights because the fifth amended information charged him with only deadly weapon enhancements. We disagree.

When a defendant challenges the charging document for the first time on appeal, we liberally construe[40] the document in favor of validity. *State v. Witherspoon*, 171 Wn. App. 271, 294, 286 P.3d 996 (2012) (citing *State v. Winings*, 126 Wn. App. 75, 84, 107 P.3d 141 (2005)). We will find the charging document sufficient if the necessary elements appear in any form or, if by fair construction, we may find them on the face of the document. *State v. Nonog*, 169 Wn.2d 220, 227, 237 P.3d 250 (2010). We review the information as a whole, according to common

---

[39] Maddaus does not challenge his other two witness tampering counts on these grounds; nor do we address them. Thus, our holding here does not affect any witness tampering counts other than Counts VI and VII.

[40] As our Supreme Court recently explained, "Liberal interpretation 'balances the defendant's right to notice against the risk of . . . 'sandbagging'—that is, that a defendant might keep quiet about defects in the information only to challenge them after the State has rested and can no longer amend it.'" *State v. Zillyette*, 2013 WL 39460664 (2013) (quoting *State v. Nonog*, 169 Wn.2d 220, 227, 237 P.3d 250 (2010)).

sense and including implied facts, to determine (1) whether the information reasonably apprised the defendant of the elements of the crime charged; and (2) whether the defendant can show that the inartful or vague language in the charging document actually prejudiced him if the information does not include all necessary elements.[41] *State v. Kjorsvick*, 117 Wn.2d 93, 105-06, 812 P.2d 86 (1991); *see also State v. Williams*, 162 Wn.2d 177, 182, 170 P.3d 30 (2007).

We analyze a sentencing enhancement as if it were an element of an offense because the enhancement increases the sentence beyond the maximum otherwise authorized for the underlying offense. *State v. Recuenco*, 163 Wn.2d 428, 434, 180 P.3d 1276 (2008). Thus, the State must include sentencing enhancements, such as deadly weapon and firearm allegations, in the information. *State v. Crawford*, 159 Wn.2d 86, 94, 147 P.3d 1288 (2006) (State must set forth in information its intent to seek enhanced penalties); *In re Bush*, 95 Wn.2d 551, 554, 627 P.2d 953 (1981).

Here, the information alleged that (1) at the time Maddaus committed first degree murder and attempted kidnapping (Counts I and III), he "was armed with a deadly weapon, a firearm"; and (2) while committing second degree assault (Count IV), Maddaus "was armed with a deadly weapon, a firearm, to wit: a semi-automatic pistol." CP at 21-22. The information also cited

---

[41] Under the first analytical prong, if we can neither find nor fairly imply an essential element of the crime in the charging document, we presume prejudice and reverse without considering whether the omission prejudiced the defendant. *State v. Goodman*, 150 Wn.2d 774, 788, 83 P.3d 410 (2004). In such cases, we reverse the conviction even if the defendant had actual knowledge of all the essential elements of the alleged crime. *State v. Kjorsvick*, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991). But if the necessary facts appear, or are implied, in some form in the charging document, we then consider the second analytical prong, prejudice. *Goodman*, 150 Wn.2d at 788. Maddaus fails to meet this test here.

No. 41795-2-II

RCW 9.94A.533(3)[42] for Counts I and IV (murder and assault), giving Maddaus express notice that the State was seeking a firearm sentencing enhancement for those two counts. CP at 21-22. Although Count III of the information did not similarly cite this firearm sentencing enhancement statute,[43] the information expressly alleged that Maddaus had been armed with a firearm while he was attempting the kidnapping. Looking at the information "according to common sense, and includ[ing] facts which are necessarily implied," as we must on a first-time post-conviction

_____

[42] RCW 9.94A.533(3) provides in part:

The following additional times shall be added to the standard sentence range for felony crimes committed after July 23, 1995, if the offender or an accomplice was armed with a firearm as defined in RCW 9.41.010 and the offender is being sentenced for one of the crimes listed in this subsection as eligible for any firearm enhancements based on the classification of the completed felony crime. If the offender is being sentenced for more than one offense, the firearm enhancement or enhancements must be added to the total period of confinement for all offenses, regardless of which underlying offense is subject to a firearm enhancement. If the offender or an accomplice was armed with a firearm as defined in RCW 9.41.010 and the offender is being sentenced for an anticipatory offense under chapter 9A.28 RCW to commit one of the crimes listed in this subsection as eligible for any firearm enhancements, the following additional times shall be added to the standard sentence range determined under subsection (2) of this section based on the felony crime of conviction as classified under RCW 9A.28.020:

(a) Five years for any felony defined under any law as a class A felony or with a statutory maximum sentence of at least twenty years, or both, and not covered under (f) of this subsection;

(b) Three years for any felony defined under any law as a class B felony or with a statutory maximum sentence of ten years, or both, and not covered under (f) of this subsection;

(c) Eighteen months for any felony defined under any law as a class C felony or with a statutory maximum sentence of five years, or both, and not covered under (f) of this subsection.

[43] But it did cite the deadly weapon enhancement statute, RCW 9.94A.602, recently recodified as 9.94A.825. LAWS OF 2009, ch. 28, § 41.

48

No. 41795-2-II

challenge to the information, we hold that the information's allegation that Maddaus was armed with a deadly weapon, "a firearm," on Count III "reasonably appris[ed]" him that the State was seeking a firearm sentencing enhancement for this attempted kidnapping charge. CP at 22. *See Kjorsvick*, 117 Wn.2d at 109.

Furthermore, in contrast with *Recuenco*,[44] the jury instructions here defined "firearm" as "a weapon or device from which a projectile may be fired by an explosive such as gunpowder." CP at 448 (Instruction 32). Each of the challenged special verdict forms also asked the jury to determine whether Maddaus was "armed with a *firearm* at the time of the commission of the crime." CP at 452, 455, 457 (emphasis added).

Contrary to Maddaus's focus on the "operative language of the [i]nformation,"[45] rather than on citation to a particular statutory authority, we conclude that the charging document reasonably apprised Maddaus that the State was seeking firearm sentencing enhancements and

---

[44] In *Recuenco*, the information charged second degree assault committed with a deadly weapon, "'to—wit: a handgun'"; but the special verdict form asked the jury to find only whether Recuenco had been "'armed with a deadly weapon.'" The jury returned a special verdict finding that Recuenco had been armed with a deadly weapon while committing the assault; but the trial court imposed a firearm sentencing enhancement rather than a deadly weapon enhancement. *Recuenco*, 163 Wn.2d at 431-32. The Supreme Court vacated Recuenco's firearm sentencing enhancement, holding that (1) the trial court had erred in imposing a sentence enhancement that had not been charged and the jury had not found; and (2) the trial court had exceeded its authority in enhancing the sentence based on a fact not found by the jury. *Recuenco*, 163 Wn.2d at 442. The Court based its holding in part on (1) the trial court's failure to define "firearm" in the jury instructions, and (2) the lack of any jury finding that the defendant had been armed with a firearm during commission of the underlying offense. *Recuenco*, 163 Wn.2d at 431-32; *see also In re Pers. Restraint of Delgado*, 149 Wn. App. 223, 236-37, 204 P.3d 936 (2009) (applying *Recuenco* where information failed to allege firearm sentencing enhancements and jury instructions failed to define "firearm").

[45] Reply Br. of Appellant at 48.

49

that the charging document matched the special verdict forms, which clearly asked the jury to decide whether Maddaus had been "armed with a firearm," during the commission of Counts I, III, and IV.[46] CP at 452, 455, 457. Maddaus fails to show that the language in his fifth amended information actually prejudiced him. Accordingly, his claim fails. *See Kjorsvik*, 117 Wn.2d at 101-02.

## B. Prior "Strike" Convictions

Maddaus next argues, for the first time on appeal, that the prosecution failed to prove his two prior "strike" convictions. Br. of Appellant at 97. This argument lacks merit.

To calculate a defendant's offender score and sentence properly, the Sentencing Reform Act of 1981, chapter 9.94A RCW, requires sentencing courts to determine a defendant's criminal history based on his prior convictions and the level of seriousness of the current offense. RCW 9.94A.505; *State v. Ross*, 152 Wn.2d 220, 229, 95 P.3d 1225 (2004). The State must prove a defendant's criminal history by a preponderance of the evidence. *State v. Hunley*, 161 Wn. App. 919, 927, 253 P.3d 448, *aff'd*, 175 Wn.2d 901, 287 P.3d 584 (2012). The best evidence of a prior conviction is a certified copy of the judgment. *State v. Mendoza*, 165 Wn.2d 913, 920, 205 P.3d 113 (2009) (quoting *State v. Lopez*, 147 Wn.2d 515, 519, 55 P.3d 609 (2002)). It is the State's obligation to ensure that the record before the sentencing court supports the criminal history determination. *State v. Ford*, 137 Wn.2d 472, 480, 973 P.2d 452 (1999).

---

[46] We also reject Maddaus's argument that a firearm enhancement cannot be imposed unless the State proved he had been armed with a working firearm. We have previously held that this language from *Recuenco* is non-binding dicta. *See State v. Raleigh*, 157 Wn. App. 728, 735, 238 P.3d 1211 (2010).

A defendant waives the right to object to inclusion of a prior conviction when he affirmatively acknowledges that the conviction was properly included in his offender score. *Ross*, 152 Wn.2d at 229-32. But a defendant's silence on the issue is not sufficient to constitute such a waiver. *Hunley*, 161 Wn. App. at 928-29.

Here, the State provided certified copies of Maddaus's prior judgment and sentences: A 1993 jury verdict of guilty for two counts of second degree assault while armed with a deadly weapon; and a 1995 guilty plea conviction for unlawful possession with intent to deliver while armed with a deadly weapon. Both offenses are "most serious offenses" under the POAA. RCW 9.94A.030(32)(b), (t). A "[m]ost serious offense" includes "[a]ny other felony with a deadly weapon verdict under RCW 9.94A.825." RCW 9.94A.030(32)(t).

Maddaus argues that his 1995 drug possession conviction was not a "'most serious offense'" under the POAA because he "pled guilty to the offense and the enhancement; thus, there was no 'verdict'," as required by RCW 9.94A.030(32)(t). Br. of Appellant at 100. In the alternative, he argues that his 1995 deadly weapon enhancement for this crime was entered "under [former] RCW 9.94A.125"[47], rather than RCW 9.94A.825, thus disqualifying it for consideration under the POAA. Br. of Appellant at 101. Maddaus's first argument lacks merit because a plea of guilty is equivalent to conviction and has the same effect as a jury verdict of guilty. *In re Williams*, 111 Wn.2d 353, 357, 759 P.2d 436 (1988). Maddaus's alternative argument also fails because the language from former RCW 9.94A.125 is identical to that in RCW 9.94A.825; and RCW 9.94A.030(32)(t) references former RCW 9.94A.125. These

---

[47] The statute was recodified as RCW 9.94A.825 in 2008. LAWS OF 2009, ch. 28, § 41.

51

portions of the SRA have changed only in their numbering, not in their substance. Thus, Maddaus's argument on this point also lacks merit.

## C. POAA Sentence

Finally, Maddaus challenges his life sentence, arguing that (1) the classification of prior convictions as "elements" in some circumstances and "sentencing factors" in others violates his state and federal equal protection rights; (2) the trial court's imposition of a life sentence violated his Sixth and Fourteenth Amendment rights to a jury determination beyond a reasonable doubt that he had two prior qualifying convictions; and (3) his life sentence without the possibility of parole violates his state constitutional due process rights. Br. of Appellant at 107. These arguments also fail.

### 1. Equal protection

Maddaus argues that the POAA violates his state and federal equal protection rights because his prior convictions allegedly elevated the offense from one category to another. He argues that when proof of a prior conviction elevates a crime, (1) the State must prove the conviction beyond a reasonable doubt, but (2) the POAA violates equal protection because it permits the State to prove his prior crimes by a mere preponderance of the evidence. We disagree.

Equal protection guarantees that persons similarly situated with respect to the legitimate purposes of the law must receive equal treatment. *State v. Williams*, 156 Wn. App. 482, 496, 234 P.3d 1174, *review denied*, 170 Wn.2d 1011 (2010); U.S. CONST. amend. XIV; WASH. CONST. art. 1, § 12. We recently analyzed the same issue in *Witherspoon*, holding that the defendant's equal protection challenge to his POAA sentence failed because there is a rational basis to distinguish

between a recidivist charged with a serious felony and a person whose conduct is felonious only because of a prior conviction for a similar offense. *Witherspoon*, 171 Wn. App. at 304-05; *see also State v. Langstead*, 155 Wn. App. 448, 454-57, 228 P.3d 799, *review denied*, 170 Wn.2d 1009 (2010); *Williams*, 156 Wn. App. at 496-99. Adhering to our rationale in *Witherspoon*, we reject Maddaus's equal protection challenge here.

### 2. Prior convictions

Maddaus next argues that the trial court violated his Sixth and Fourteenth Amendment rights when it failed to prove his prior qualifying convictions by a jury determination beyond a reasonable doubt. Again, we recently rejected this same argument in *Witherspoon*. We recognized that current Washington Supreme Court case law interpreting the POAA has "consistently continued to hold that a judge can determine a prior conviction for POAA sentencing purposes and that a jury determination is not required." *Witherspoon*, 171 Wn. App. at 317 (citing *State v. Smith*, 150 Wn.2d 135, 143, 75 P.3d 934 (2003), *cert. denied*, 541 U.S. 909, 124 S. Ct. 1616, 158 L. Ed. 2d 256 (2004); *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 256–57, 111 P.3d 837 (2005); *State v. Mutch*, 171 Wn.2d 646, 659, 254 P.3d 803 (2011)). We further noted that all three divisions of the Washington Court of Appeals have also rejected this argument. *Witherspoon*, 171 Wn. App. at 317 (citing *State v. Rivers*, 130 Wn. App. 689, 692, 128 P.3d 608 (2005) (Division One), *review denied*, 158 Wn.2d 1008 (2006), *cert. denied*, 549 U.S. 1308 (2007); *State v. McKague*, 159 Wn. App. 489, 515–17, 246 P.3d 558 (Division Two), *aff'd*, 172 Wn.2d 802, 262 P.3d 1225 (2011); *State v. O'Connell*, 137 Wn. App. 81, 90–91, 152 P.3d 349 (Division Three), *review denied*, 162 Wn.2d 1007 (2007)). Again adhering to existing case law, we hold that Maddaus's argument also fails here.

### 3. Due process balancing test

Finally, Maddaus argues that the imposition of a life sentence without parole violates due process under article 1, section 3 of the Washington constitution when analyzed under the civil liberties deprivation test outlined by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).[48] We disagree.

In *State v. Heddrick*, our Supreme Court explicitly rejected the *Mathews* test for criminal matters. *State v. Heddrick*, 166 Wn.2d 898, 904 n.3, 215 P.3d 201 (2009). Instead, it applied the due process analysis found in *Medina v. California*, 505 U.S. 437, 443, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). *Heddrick*, 166 Wn.2d at 904 n.3 ("[T]he *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules.") (citing *Medina*, 424 U.S. at 334-35). Nevertheless, our Supreme Court did use *Mathews* to resolve a due process challenge in the context of assessing a witness's competency to testify, but only because the issue (witness competency) might "arise in a civil or criminal proceeding." *State v. Brousseau*, 172 Wn.2d 331, 346 n.8, 259 P.3d 209 (2011).

Maddaus's due process question focuses on the procedure for determining a criminal defendant's prior history under the POAA—an issue "that is unique to the criminal context." *Brousseau*, 172 Wn.2d at 346 n.8. Therefore, in light of our Supreme Court's limited application of the *Mathews* test in *Brousseau*, we decline Maddaus's invitation to apply the *Mathews* test

---

[48] In *Mathews*, the United States Supreme Court held that, in determining what process is due in a given situation, courts should weigh (1) the private interest at stake; (2) the risk of an erroneous deprivation of such interest through current procedures, and the probable value of additional or substitute procedural safeguards; and (3) the government interest, including the additional burden of added procedural safeguards. *Mathews*, 424 U.S. at 321.

here. Because he presents no other argument in support of his due process claim, we hold that he has failed to show that existing procedural safeguards under the POAA are insufficient.

## VIII. REMAINING ADDITIONAL GROUNDS (SAG)

### A. Request for New Appointed Counsel

Maddaus asserts that the trial court erred in denying his request to fire his attorney and for appointment of new counsel. We disagree.

A defendant has the right to retain his counsel of choice; denial of a request to retain new counsel may unlawfully deprive the defendant of that right. *State v. Chase*, 59 Wn. App. 501, 506, 799 P.2d 272 (1990). But the right to retain the counsel of one's choice is not unlimited; instead, the request must be made within a reasonable time before trial. *Chase*, 59 Wn. App. at 506. Absent substantial reasons for delay, a late request will generally be denied, especially if a continuance may delay trial. *Chase*, 59 Wn. App. at 506. We review a trial court's denial of a motion to substitute counsel for abuse of discretion. *State v. Stenson*, 132 Wn.2d 668, 733, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). To determine whether the trial court abused its discretion in denying a defendant's request for substitute counsel, we consider the (1) extent of the alleged conflict, (2) adequacy of the trial court's inquiry, and (3) timeliness of the request. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 724, 16 P.3d 1 (2001).

On the third day of trial, Maddaus asked for new counsel, stating,

> Yeah, at this time I'd like to fire my counsel. I need new counsel. I can't afford to hire [retained counsel] and continue to pay him like this. I've asked him to do several things. A letter, I don't know, somehow from me to Mr. Woodrow made it to the prosecutor's office. Now, it might be possible that Mr. Woodrow could have been the one to send that letter himself. I didn't do it.

3 VRP at 263-64. The trial court responded, "I am not going to allow it at this late date. . . . I have already ruled on the letter." 3 VRP at 264. Maddaus did not provide any new substantial reason to support his request for new counsel, especially in light of the lateness of his request three days into the trial. Thus, we hold that the trial court did not abuse its discretion in denying this request.

## B. Judicial Bias

Maddaus also asserts that the trial court was biased against him and failed to act impartially because the trial court denied several of his counsel's requests to be heard outside the presence of the jury and "ma[de] a bunch of rulings all in favor of the state." SAG at 46. The record does not support these assertions.

We presume that a judge acts without bias or prejudice. *State v. Dominguez*, 81 Wn. App. 325, 330, 914 P.2d 141 (1996). The law requires both actual impartiality and the appearance of impartiality of a judge. *State v. Post*, 118 Wn.2d 596, 618, 826 P.2d 172, 837 P.2d 599 (1992). Having reviewed the record, we find no basis to support Maddaus's claim that the trial judge was either actually or apparently biased against Maddaus. *Dominguez*, 81 Wn. App. at 330.

## C. Cumulative Error

Finally, Maddaus asserts that we must reverse his convictions under the cumulative error doctrine. Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless, when the errors combined denied the defendant a fair trial. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006); *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). The defendant, however, bears the burden of proving an accumulation of

No. 41795-2-II

error of such magnitude that retrial is necessary. *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009). Maddaus has failed to satisfy his burden of demonstrating an accumulation of errors sufficient to require a retrial on all counts; furthermore, most of his alleged errors considered individually have failed. Thus, the cumulative error doctrine does not apply.

We remand to the trial court to vacate either Count VI or Count VII because these two witness tampering convictions were based on a single unit of prosecution and should result in a single conviction at resentencing. We affirm Maddaus's other convictions and his firearm sentencing enhancements.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

I concur:

Johanson, A.C.J.

57

QUINN-BRINTNALL, J. (concurring) — I agree with the entirety of the majority opinion with the exception of its analysis that Robert Maddaus does not have the right for a jury to find whether he is a persistent offender subject to incarceration for life without the possibility of parole under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570. For the reasons stated in my opinions in *State v. Witherspoon*, 171 Wn. App. 271, 306, 286 P.3d 996 (2012) (plurality opinion), *review granted*, 177 Wn.2d 1007 (2013), *State v. McKague*, 159 Wn. App. 489, 525, 246 P.3d 558 (Quinn-Brintnall, J., concurring in part and dissenting in part), *aff'd*, 172 Wn.2d 802, 262 P.3d 1225 (2011), and *State v. Rudolph*, 141 Wn. App. 59, 72, 168 P.3d 430 (2007) (Quinn-Brintnall, J., dissenting), *review denied*, 163 Wn.2d 1045 (2008), I continue to question a trial court's constitutional authority to impose a sentence beyond that supported by a jury verdict based on a trial court's factual finding that a defendant is a persistent offender. But because of a key factual distinction between the present case and those considered in my dissenting analyses on this issue in the opinions referenced above, I conclude that any violation of Maddaus's jury trial rights in this instance is harmless and concur with the majority's result on the POAA issue.

In both *Witherspoon* and *McKague*, I discussed how the trial court's imposed sentence exceeded the maximum statutory penalty for the offense of conviction established by the legislature. In both cases, the defendant's "third strike" for purposes of the POAA involved a class B felony with a statutory maximum penalty of 10 years confinement. *Witherspoon*, 171 Wn. App. at 314 (defendant's third strike involved second degree robbery, a class B felony that normally carries a maximum penalty of 10 years confinement); *McKague*, 159 Wn. App. at 527 n.22 (Quinn-Brintnall, J., concurring in part and dissenting in part) (defendant's second degree

assault conviction, a class B felony, had a statutory maximum penalty of 10 years confinement). And in both cases the trial court sentenced the defendant to a sentence longer than the statutory maximum of 10 years confinement—life without the possibility of parole—without a jury finding that the defendant was a persistent offender beyond a reasonable doubt. *Witherspoon*, 171 Wn. App. at 314; *McKague*, 159 Wn. App. at 527 (Quinn-Brintnall, J., concurring in part and dissenting in part). In my view, this procedure does not comport with longstanding practice in Washington nor the Sixth Amendment's protections of a defendant's jury trial rights. *See, e.g., Witherspoon*, 171 Wn. App. at 305-08. By imposing a sentence that exceeds the one supported by the jury verdict, as in *McKague* and *Witherspoon*, a defendant's Sixth Amendment right to have his sentence supported by a jury's verdict remains unfulfilled.

But here, a jury entered a guilty verdict finding Maddaus guilty of first degree felony murder. First degree felony murder is a class A felony. RCW 9A.32.030(2). The statutory maximum sentence for class A felonies is confinement for life. RCW 9A.20.021(1)(a). The trial court sentenced Maddaus to life without the possibility of parole under the POAA. Our Supreme Court has previously determined that in the context of the POAA, there is no significant difference between a life sentence with the possibility of parole and a sentence of life without the possibility of parole. *State v. Thomas*, 150 Wn.2d 821, 847-48, 83 P.3d 970 (2004); *State v. Rivers*, 129 Wn.2d 697, 714, 921 P.2d 495 (1996). Accordingly, in contrast with *McKague* and *Witherspoon*, the trial court here imposed a sentence within the permitted statutory maximum of

No. 41795-2-II

the offense of conviction. Therefore, Maddaus's sentence is supported by the jury's verdict and any violation of Maddaus's jury trial rights in this instance is harmless.

QUINN-BRINTNALL, J.